THOMAS, Judge.
D.N.R. was born in Pennsylvania on July 26,1993. D.N.R.’s father is unknown, and T.D. (“the biological mother”) consented to the termination of her parental rights on June 26, 1998, in the Court of Common Pleas of Lawrence County, Pennsylvania (“the Pennsylvania court”). D.N.R. lived with W.R.M. until W.R.M.’s death; however, the record does not reveal whether W.R.M. adopted D.N.R. W.R.M. was survived by her husband J.M.
The record contains a copy of the Pennsylvania court’s August 9, 2006, judgment that incorporated a consent agreement entered into by J.M. and J.W. (“the custodian”), the sister of W.R.M.[1] The *399 Pennsylvania court awarded primary physical custody and sole legal custody of D.N.R. to the custodian and awarded J.M. visitation and the right to review D.N.R.’s medical, dental, psychiatric, psychological, and academic records. The judgment of the Pennsylvania court included a provision in which K.R. (“the custodian’s sister”) would receive custody of D.N.R. upon the incapacitation or death of the custodian.[2] D.N.R. moved to Alabama with the custodian in 2006.
On July 18, 2011, D.N.R.’s guardian ad litem filed a petition in the Lauderdale Juvenile Court asserting that D.N.R. was dependent and requesting that her custody be awarded to the Lauderdale Department of Human Resources (“DHR”). The petition alleged that D.N.R. lived with the custodian, that D.N.R.’s mother was deceased and her father was unknown, that the custodian was not providing for D.N.R.’s care, support, or education, and that D.N.R.’s health, safety, and well being were at risk. A shelter-care hearing was set for July 20, 2011. At the shelter-care hearing, the juvenile-court judge stated: “We are here today for a determination of the dependency and a 72-hour hearing.” DHR’s attorney and D.N.R.’s guardian ad litem stipulated to D.N.R.’s dependency; however, the custodian, who was acting pro se, never stipulated to D.N.R.’s dependency; she admitted only that D.N.R. had “a lot of issues.”
Nothing asserted in the pleadings or stated at the shelter-care hearing would have revealed the existence of the judgments of the Pennsylvania court to the juvenile court, although we note that the action underlying these appeals is case number JU-10-176.05 and it is apparent to this court that D.N.R. had been before the juvenile court at least three other times. Before witnesses were called, the attorneys and the juvenile-court judge had a discussion regarding a certain delinquency charge against D.N.R. in “the .04 case” that was scheduled to be heard by the juvenile court later that same day.[3]
At the time of the July 20, 2011, shelter-care hearing, D.N.R. had lived with the custodian for more than five years; however, the juvenile-court judge questioned the custodian as to whether she had “paperwork showing that [she] ha[d] custody,” to which the custodian replied: “Not with me.” The juvenile-court judge said:
“The reason Pm asking these questions because if you are determined to be [D.N.RJs legal custodian, then we probably need to have an attorney appointed to represent you and your interests in these cases or in this case. So it would be very beneficial to all of us if you could find that paperwork and let us know because as far as we know, there’s no order that we know of saying you have custody of [D.N.R.], okay?”
Sarah Hendershot, a DHR employee, testified that DHR could not “establish who the legal guardian is right now.” The juvenile court heard testimony that DHR had treated D.N.R. “like a teenager that *400 was found on the street” because DHR had no proof that the custodian had legal custody of D.N.R., although Hendershot also agreed that D.N.R. was accompanied in the shelter-care hearing by her “physical custodian, her aunt,” who “was providing home, supervision, and custody for [D.N.R.].” Hendershot testified that DHR had received information indicating that the custodian had been “possibly emotionally abusive” and had made “harmful statements” to D.N.R. Hendershot said that if the juvenile court awarded D.N.R.’s custody to DHR, part of the services provided to the custodian would be the determination of the “status of custody.” The juvenile court neither appointed an attorney for the custodian nor afforded her an opportunity to testify or to examine Hender-shot. The following exchange took place at the end of the shelter-care hearing:
“THE COURT: I think it’s sufficient. All right. Based on the evidence and testimony, along with the stipulations of the parties, the Court finds this hearing is being held within 72 hours. This pick-up is warranted and necessary under the conditions stated and [D.N.R.] is dependent and I will declare the child dependent today. Therefore, custody will remain with [DHR] pending an adjudicatory hearing which will be set, I guess, some time within the next 60 days. Anything else we need to take up at this time?
“[The custodian]: Judge?
“THE COURT: Yes, ma’am.
“[The custodian]: Those papers [indicating that the custodian was D.N.R.’s legal custodian] — I’ve been trying to get somebody’s attention. I think they’re downstairs, and I think I had them recorded.
“THE COURT: Okay. Well, if you find them, it will help them and assist them.
“[DHR’s attorney]: It’s a good start.
“[The custodian]: I’m pretty sure I took them and had them recorded.”
On July 21, 2011, the juvenile court entered its order, transferring pendente lite custody of D.N.R. to DHR, and, in a handwritten addition to its findings, it included a sentence that reads: “The Court finds the minor child dependent.” The custodian did not appeal the July 21, 2011, judgment.
D.N.R. was placed in a foster home, and the juvenile court set an adjudicatory hearing for August 26, 2011. On July 26, 2011, D.N.R. reached 18 years of age. A transcript of the August 26, 2011, adjudicatory hearing is included in the record. At that hearing W.R.M. was referred to as the “adopted mother” and the custodian was referred to as “the guardian.” The custodian was represented by an attorney at the August 26, 2011, hearing. DHR offered a report into evidence in which it confirmed that the custodian had been D.N.R.’s legal guardian and asserted that D.N.R. had been “diagnosed with Mental Retardation.” The custodian stipulated to D.N.R.’s dependency, and the juvenile court entered a judgment on August 26, 2011, again adjudicating D.N.R. dependent. The custodian did not appeal the August 26, 2011, judgment.
The case was set for a review hearing in January 2012, and, on January 30, 2012, the juvenile court entered an order in which it found “that reasonable efforts toward reunification [with the custodian] have been made, and the most appropriate plan is Adult Custodial Care.” The custodian did not appeal the January 30, 2012, judgment. DHR placed D.N.R. with the biological mother in Pennsylvania in June 2012.
On June 27, 2012, the custodian’s sister filed a motion to intervene for the purpose of seeking custody of D.N.R. On July 20, *401 2012, the biological mother and her partner, M.J.K., filed a petition for custody of D.N.R. That same day, the juvenile court signed a permanency-hearing-order form that included its findings that DHR had made reasonable efforts to reunite D.N.R. with the custodian and that, as of July 12, 2012, D.N.R. should be “returned to [the biological mother]” who was denoted as “the parent.” The custodian and the custodian’s sister opposed D.N.R.’s change of custody in several filings, including an emergency motion for the return of D.N.R. to Alabama and a motion for the appointment of a different guardian ad litem. A permanency hearing was held on July 20, 2012.
At the July 20, 2012, permanency hearing, Labrisca Cook, a DHR employee, was the only witness called to testify. Cook recommended that D.N.R.’s permanency plan should be “return to parent,” referring to the biological mother as the parent. Cook said that D.N.R. had been in foster care for one year and that at the time of the hearing she had been placed with the biological mother for one month. According to Cook, the biological mother was an approved foster parent in Pennsylvania; her house was approved by the Lawrence County Children and Youth Services in New Castle, Pennsylvania, and the Federal Bureau of Investigation had completed background checks on the biological mother. Cook testified that the biological mother and M.J.K. were capable of providing financially for D.N.R. and that D.N.R. desired to live with the biological mother. Cook stated that DHR had investigated the reason for which the biological mother’s parental rights had been terminated; however, she admitted that that investigation consisted of nothing more than asking the biological mother for explanation of the reason.[4]
According to Cook, D.N.R. did not desire to live with the custodian, the custodian had not visited with D.N.R. in the past year, and the custodian had attended only two of three Individualized Service Plan meetings regarding D.N.R. She testified that, during the time that D.N.R. had lived with the custodian, D.N.R. had not had a bedroom in the custodian’s “spacious” house, although a younger child had a large bedroom with an attached bathroom. Cook said that D.N.R. had slept in a “little loft” that was not enclosed. Cook testified that the custodian had been “indicated [for] physical abuse, bizarre discipline, and also mental and emotional abuse as well.” On cross-examination Cook admitted that the findings of “indicated” for physical abuse and bizarre discipline resulted from her “withholding food and water” from D.N.R. She said that she was not aware whether the physical abuse/bizarre discipline occurred more than once, but there was testimony that D.N.R. had failed to provide water to the family’s pets, which was her chore, and that the custodian had once withheld water from D.N.R. for an unknown period as a method of discipline to teach D.N.R. the importance of her chore. Cook admitted that D.N.R. was “in good health” and of normal weight when she entered foster care.
On July 26, 2012, the juvenile court signed an order that stated that D.N.R. “shall be returned to [the biological mother],” but it failed to address the other pending motions. On August 6, 2012, the custodian and the custodian’s sister filed separate motions to reconsider the July 26, 2012, order, which the juvenile court denied on August 20, 2012. That same day, *402 the juvenile court entered the following judgment that read, in its entirety:
“BASED UPON the report and recommendation of the guardian ad litem submitted on July 19, 2012, and the recommendation of [DHR], legal and physical custody of [D.N.R.] is hereby awarded to the biological mother[ ].
“All other pending motions and requests are hereby denied.”
DHR filed a postjudgment motion seeking a deletion of the portion of the August 20, 2012, judgment in which the juvenile court had specified that it had based its judgment on DHR’s recommendation and an amendment of the judgment to allow DHR to monitor D.N.R.’s placement with the biological mother. The juvenile court entered an amended judgment, deleting the requested portion of its judgment on August 23, 2012, and allowing DHR to monitor D.N.R.’s placement for a minimum of six months.
DHR and the guardian ad litem also filed a joint motion requesting an order requiring the custodian and the custodian’s sister to cease publishing “confidential information” in violation of Ala.Code 1975, § 12-15-133(g). Exhibits attached to the joint motion included a newspaper advertisement for a Web site where persons could post comments regarding the Laud-erdale family court, DHR caseworkers, or guardians ad litem. The custodian’s sister had posted a narrative in which she identified the juvenile-court judge, DHR employees, and attorneys involved in the underlying action by name, but she used fictitious or shortened names for D.N.R., the custodian, and the biological mother. Other persons, including the custodian, had posted comments on the Web site. The custodian’s comment did not include D.N.R.’s name.
On August 20, 2012, the juvenile court entered a “cease and desist order,” forbidding the custodian and the custodian’s sister from “dissemination of names, identities[,] or other confidential information which are protected by statu[t]e, via the newspaper, internet website and other social networking media, and/or by any other form.” On August 31, 2012, the custodian and the custodian’s sister filed separate appeals with this court, which we consolidated ex mero motu on October 5, 2012.

DHR’s Letter Brief

DHR, in a letter brief to this court, urges this court to dismiss the appeals, contending that D.N.R. was 18 years of age when she was adjudicated dependent on August 26, 2011.[5] If that were true, we would grant DHR’s request, because, in order for a child to be adjudicated a dependent child, he or she must meet the definition of the term' “child” that is contained in Ala.Code 1975, § 12-15-102(3): “An individual under the age of 18 years, or under 21 years of age and before the juvenile court for a delinquency matter arising before that individual’s 18th birthday....” However, DHR fails to acknowledge the juvenile court’s handwritten addition to its July 21, 2011, order that included the sentence: “The Court finds the minor child dependent.” We conclude that D.N.R. was adjudicated dependent on July 21, 2011, which was 5 days before she reached the age of 18. Therefore, the appeals cannot be dismissed on the ground that DHR asserts.

The Custodian’s Sister’s Appeal

The custodian’s sister seeks our review of whether the juvenile court received clear and convincing evidence to support its July 21, 2011, dependency finding and of whether the juvenile court had jurisdiction over the cause. However, the *403 custodian’s sister’s motion to intervene was denied on August 20, 2012, by the juvenile court. The custodian’s sister failed to raise an argument in her postjudgment motion that the juvenile court exceeded its discretion by denying her motion to intervene and, likewise, she has failed to raise that argument on appeal.
“ ‘ “Unless a person is a party to a judgment, he [cannot] appeal from that judgment. That fundamental principle is one of the oldest in Alabama jurisprudence.” Daughtry v. Mobile County Sheriff’s Dep’t, 536 So.2d 953, 954 (Ala.1988). “One must have been a party to the judgment below in order to have standing to appeal any issue arising out of that judgment.” Mars Hill Baptist Church of Anniston v. Mars Hill Missionary Baptist Church, 761 So.2d 975, 980 (Ala.1999) (emphasis added [in Boschert ]). See also Triple J Cattle, Inc. v. Chambers, 621 So.2d 1221 (Ala.1993).
“ ‘Boschert has never been a defendant, a representative, or a member of the plaintiff class in the Naef case. It is not an intervenor. Consequently, the notice of appeal filed by Boschert failed to invoke the appellate jurisdiction of this Court. For these reasons, the appeal must be dismissed.’
“[Boschert Merrifield Consultants, Inc. v. Masonite Corp.,] 897 So.2d [1048,] 1051-52 [ (Ala.2004) ].”
McCollum v. Keating, 5 So.3d 1283, 1287 (Ala.Civ.App.2008). Likewise, the custodian’s sister was neither a party nor an intervenor in the underlying action. The custodian’s sister has failed to invoke the appellate jurisdiction of this court, and her appeal is therefore is dismissed.
The Custodian’s Appeal — Subject-matter Jurisdiction
The custodian seeks this court’s review of a number of issues. Among her issues are assertions that the juvenile court lacked subject-matter jurisdiction to enter its July 21, 2011, dependency order and that, therefore, it lacked jurisdiction under the Uniform Child Custody Jurisdiction and Enforcement Act (“UCCJEA”), codified at Ala.Code 1975, § 30-3B-101 et seq., to award custody of D.N.R. to the biological mother on July 26, 2012.[6]
No one argued to the juvenile court that it must comply with the directives of the UCCJEA, and no one informed the juvenile court in pleadings or at the July 20, 2011, shelter-care hearing that the Pennsylvania court had made an initial custody determination as to D.N.R. In fact, the first mention of the jurisdictional requirements of the UCCJEA comes on appeal to this court.
“However, in the context of a custody matter controlled by the UCCJEA, ‘jurisdiction to make a child custody determination is subject matter jurisdiction,’ and ‘an agreement of the parties to confer jurisdiction on a court that would not otherwise have jurisdiction under the [UCCJEA] is ineffective.’ Ala.Code 1975, § 30-3B-201, Official Comment (emphasis added).”
M.B.L. v. G.G.L., 1 So.3d 1048, 1051 (Ala. Civ.App.2008).
“ ‘[S]ubject-matter jurisdiction may not be waived; a court’s lack of subject-matter jurisdiction may be raised at any time by any party and may even be raised by a court ex mero motu.’ ” S.B. U. v. D.G.B., 913 So.2d 452, 455 (Ala.Civ.App. *404 2005) (quoting C.J.L. v. M.W.B., 868 So.2d 451, 453 (Ala.Civ.App.2003)). Questions of law, such as whether a court has subject-matter jurisdiction, are reviewed de novo. BT Sec. Corp. v. W.R. Huff Asset Mgmt. Co., 891 So.2d 310 (Ala.2004).
In this case, the Pennsylvania court made an initial custody determination as to D.N.R., and the juvenile court modified that determination.[7] Thus, we conclude that this case is controlled by the UC-CJEA, which prescribes the requirements that must be met in order for a court of this state to modify an initial custody determination of another state. We must determine whether the juvenile court had jurisdiction to modify the Pennsylvania court’s judgment pursuant to § 30-3B-201(a)(1) or (2), Ala.Code 1975, (discussed infra) and either § 30-3B-203(l) or (2), Ala.Code 1975. Section 30-3B-203 provides, in its entirety:
“Except as otherwise provided in Section 30-3B-204, a court of this state may not modify a child custody determination made by a court of another state unless a court' of this state has jurisdiction to make an initial determination under Section 30-3B-201(a)(l) or (2) and:
“(1) The court of the other state determines it no longer has continuing, exclusive jurisdiction under Section 30-3B-202 or that a court of this state would be a more convenient forum under Section 30-3B-207; or
“(2) A court of this state or a court of the other state determines that the child, the child’s parents, and any person acting as a parent do not presently reside in the other state.”
On July 20, 2011, Hendershot testified that D.N.R. “was without a parent, a natural parent, mother or father, that was this day able or capable of providing for her immediate care, supervision or control.” Hendershot testified that “[DHR] ha[s] no knowledge, no proof that [D.N.R.j’s alleged adopted mother [W.R.M.], ever had legal custody. She is now deceased, and so [W.R.M.’s] sister, [the custodian], has [D.N.R.] living with her [in Alabama].” Thus, we conclude that the requirements of § 30-3B-203(2) are satisfied because the juvenile court had before it evidence indicating that neither D.N.R., nor her parents, nor any person acting as her parent resided in Pennsylvania.[8] Next, we analyze whether the requirements of either § 30-3B-201(a)(l) or (2) were satisfied.
Section 30-3B-201(a)(l) and (2) read:
“(a) Except as otherwise provided in Section 30-3B-204, a court of this state has jurisdiction to make an initial child custody determination only if:
“(1) This state is the home state of the child on the date of the commencement of the proceeding, or was the home state of the child within six months before the commencement of the proceeding and the child is absent from this state but a parent or person acting as a parent continues to live in this state;
*405 “(2) A court of another state does not have jurisdiction under subdivision (1), or a court of the home state of the child has declined to exercise jurisdiction on the ground that this state is the more appropriate forum under Section 30-3B-207 or 30-3B-208, and:
“a. The child and the child’s parents, or the child and at least one parent or a person acting as a parent, have a significant connection with this state other than mere physical presence; and
“b. Substantial evidence is available in this state concerning the child’s care, protection, training, and personal relationships.”
We determine that Alabama was D.N.R.’s home state and that the custodian was the person acting as her parent on July 18, 2011. Section 30-3B-102(7) defines “home state,” in pertinent part, as “[t]he state in which a child lived with a parent or a person acting as a parent for at least six consecutive months immediately before the commencement of a child custody proceeding....” Section 30-3B-102(13) defines a “person acting as a parent” as
“[a] person, other than a parent, who:
“a. Has physical custody of the child or has had physical custody for a period of six consecutive months, including any temporary absence, within one year immediately before the commencement of a child custody proceeding; and
“b. Has been awarded legal custody by a court or claims a right to legal custody under the law of this state.”
The juvenile court received undisputed evidence indicating that the custodian had physical custody of D.N.R. as defined by § 30-3B-102(14). “Physical custody” is defined in that statute simply as “[t]he physical care and supervision of a child.” Id. Alabama was D.N.R.’s home state; no parent or person acting as her parent in Pennsylvania had physical custody of D.N.R. within six months of July 18, 2011. The evidence presented to the juvenile court satisfied the requirements of § 30-3B-201(a)(l). Thus, we conclude that the custodian’s argument that the juvenile court lacked subject-matter jurisdiction to enter its July 21, 2011, dependency order and that it lacked continuing jurisdiction to award custody of D.N.R. to the biological mother must fail.

The Custodian’s Remaining Issues

For purposes of discussion, we categorize the custodian’s remaining issues as follows: (1) issues regarding the July 21, 2011, order, (2) issues regarding the July 26, 2012, order, and (3) an issue regarding the August 20, 2012, cease-and-desist order.
First, the custodian argues that the juvenile court violated her right to due process; she complains that the juvenile court failed to provide her with notice that the shelter-care hearing would be a “dependency” hearing and failed to provide her with representation by an attorney at that hearing. Furthermore, she alleges that the juvenile did not have before it clear and convincing evidence indicating that D.N.R. was dependent on July 21, 2011. Regardless of our views on the merits of these arguments, we lack jurisdiction to rule upon any issues pertaining to the July 21, 2011, order. “Written notice of appeal shall be filed within 14 days of the date of the entry of order or judgment appealed from, whether the appeal is to an appellate court or to the circuit court for trial de novo.” Rule 28(C), Ala. R. Juv. P. The custodian’s notice of appeal as to the July 21, 2011, order was required to have been filed no later than August 3, 2011, to be timely. Because the custodian did not *406 file this appeal until August 31, 2012— more than a year after the 14-day period had expired — this court has no jurisdiction to consider her appeal insofar as it challenges the July 20, 2011, order. See Rule 2(a)(1), Ala. R.App. P. (“An appeal shall be dismissed if the notice of appeal was not timely filed to invoke the jurisdiction of the appellate court.”); R.P.M. v. P.D.A., 112 So.3d 49, 51 (Ala.Civ.App.2012). We, therefore, dismiss the custodian’s appeal in part.
In the second set of remaining issues— those pertaining to the July 26, 2012, order — the custodian argues (1) that the juvenile court did not have before it clear and convincing evidence indicating that D.N.R. was dependent on July 26, 2012, and (2) that the juvenile court should have granted her postjudgment motion, her emergency motion for the return of D.N.R. to Alabama, and her motion for the appointment of a different guardian ad litem. We address the issue regarding the dependency determination first.
‘With regard to the standard this court applies in reviewing a dependency determination, this court has stated:
“ ‘A finding of dependency must be supported by clear and convincing evidence. [Former] § 12 — 15—65(f)[, Ala. Code 1975 (now codified at § 12-15-310, Ala.Code 1975)]; M.M.S. v. D.W., 735 So.2d 1230, 1233 (Ala.Civ. App.1999). However, matters of dependency are within the sound discretion of the trial court, and a trial court’s ruling on a dependency action in which evidence is presented ore tenus will not be reversed absent a showing that the ruling was plainly and palpably wrong. R.G. v. Calhoun County Dep’t of Human Res., 716 So.2d 219 (Ala.Civ.App.1998); G.C. v. G.D., 712 So.2d 1091 (Ala.Civ.App.1997); and J.M. v. State Dep’t of Hu-
man Res., 686 So.2d 1253 (Ala.Civ.App.1996).
“J.S.M. v. P.J., 902 So.2d 89, 95 (Ala.Civ.App.2004). ‘Clear and convincing evidence’ is
“ ‘[e]vidence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion. Proof by clear and convincing evidence requires a level of proof greater than a preponderance of the evidence or the substantial weight of the evidence, but less than beyond a reasonable doubt.’
“§ 6-ll-20(b)(4), Ala.Code 1975.”
T.E.W. v. T.S., 97 So.3d 157, 161 (Ala.Civ. App.2012).
The custodian, in a one-page argument, urges this court to discount the testimony of the only witness to testify at the July 20, 2012, permanency hearing because it “consisted of a lot of hearsay statements and leading questions” and because “nothing clearly and convincingly established that [D.N.R.] was dependent.” However, she has failed to refer this court to relevant legal authority supporting her argument. Her lone citation to M.G. v. J.T., 90 So.3d 762 (Ala.Civ.App.2012), does not support her argument. In that case a juvenile court did not have before it clear and convincing evidence of dependency because an adjudicatory hearing had not been conducted. 90 So.3d at 766.
“ ‘It is the appellant’s burden to refer this Court to legal authority that supports its argument. Rule 28(a)(10), Ala. R.App. P., requires that the argument in an appellant’s brief include “citations to the cases, statutes, [and] other authorities ... relied on.” Consistent with Rule 28, “[w]e have stated that it is not the function of this court to do a party’s
*407 legal research.” Spradlin v. Spradlin, 601 So.2d 76, 78 (Ala.1992) (citing Henderson v. Alabama A & M University, 488 So.2d 392, 392 (Ala.1986) (“‘Where an appellant fails to cite any authority, we may affirm, for it is neither our duty nor function to perform all the legal research for an appellant.’ Gibson v. Nix, 460 So.2d 1346, 1347 (Ala.Civ.App.1984).”)).’ ”
Mullins v. Sellers, 80 So.3d 935, 945 (Ala.Civ.App.2011) (quoting Board of Water & Sewer Comm’rs of City of Mobile v. Bill Harbert Constr. Co., 27 So.3d 1223, 1254 (Ala.2009)).
Furthermore, the custodian had stipulated to D.N.R.’s dependency at the August 26, 2011, adjudicatory hearing, she did not testify or call witnesses at the July 20, 2012, permanency hearing, and she did not raise the issue of a lack of clear and convincing evidence of dependency in her August 6, 2012, postjudgment motion. Thus, we cannot consider her argument because she is raising it for the first time on appeal. See Andrews v. Merritt Oil Co., 612 So.2d 409, 410 (Ala.1992) (this court may not consider arguments that are presented for the first time on appeal).
We next address the custodian’s argument that the juvenile court should have granted her August 6, 2012, postjudgment motion, which included a vague reference to her previously filed emergency motion for the return of D.N.R. to Alabama and her motion for the appointment of a different guardian ad litem, as to which the juvenile court had not entered a ruling.
“In general, whether to grant or to deny a posttrial motion is within the sound discretion of the trial court, and the exercise of that discretion will not be disturbed on appeal unless by its ruling the court abused some legal right and the record plainly shows that the trial court erred. See Green Tree Acceptance, Inc. v. Standridge, 565 So.2d 38 (Ala.1990).”
Flagstar Enters., Inc. v. Foster, 779 So.2d 1220, 1221 (Ala.2000).
The custodian’s bare allegation in her brief to this court that “the failure of the juvenile court in not setting aside its orders and returning [D.N.R.] to the custody of [the custodian] was plainly wrong and an abuse of discretion” does not demonstrate error to this court. However, the custodian cites Hamrick v. Hamrick, 508 So.2d 282 (Ala.Civ.App.1987), and Phillips v. Phillips, 395 So.2d 1040 (Ala.Civ.App. 1981), which explain that this court can reverse a judgment if the record discloses a manifest abuse of discretion. Hamrick, 508 So.2d at 284.
In her postjudgment motion, the custodian continued to point out to the juvenile court its alleged failings at the July 20, 2011, shelter-care hearing, at which, she said, “her rights as a the legal guardian were not only violated but also disregarded.” We might agree that the record discloses a manifest abuse of discretion regarding the July 20, 2011, shelter-care hearing and the July 21, 2011, order; however, the record does not disclose a similar manifest abuse of discretion with respect to the July 26, 2012, order. Thus, we affirm the juvenile court’s denial of the custodian’s August 6, 2012, postjudgment motion.
Finally, the custodian argues that the juvenile court violated her First Amendment right to free speech by granting DHR’s and the guardian ad litem’s joint motion to cease and desist.
“ ‘A court has a duty to avoid constitutional questions unless essential to the proper disposition of the case. Doughty v. Tarwater, 261 Ala. 263, 73 So.2d 540 (1954); Moses v. Tarwater, 257 Ala. 361, 58 So.2d 757 (1952); Lee v. Macon Co. *408 Board, of Education, 231 F.Supp. 743 (M.D.Ala.1964).’ ”
Lowe v. Fulford, 442 So.2d 29, 33 (Ala. 1983) (quoting the trial court’s order).
We do not reach the custodian’s constitutional question because we determine that the juvenile court is incorrect that the custodian and the custodian’s sister had violated Ala.Code 1975, § 12-15-133(g), which pertains to the confidentiality of the records of juvenile proceedings. Subsection (g) provides in its entirety:
“(g) Except for the purposes permitted and in the manner provided by this section, whoever discloses or makes use of or knowingly permits the use of information identifying a child, or the family of a child, who is or was under the jurisdiction of the juvenile court, where this information is directly or indirectly derived from the records of the juvenile court or acquired in the course of official duties, upon conviction thereof, shall be guilty of a Class A misdemeanor under the jurisdiction of the juvenile court and also may be subject to civil sanctions. Provided, however, that nothing in this section shall be construed to prohibit or otherwise limit counsel from disclosing confidential information obtained from the juvenile court file of the child as needed to investigate the case of the client or prepare a defense for that client, provided that the disclosure is in furtherance of counsel’s representation of the party.”
We have reviewed the exhibits attached to the joint motion to cease and desist, and we agree with the custodian that the exhibits did not identify D.N.R. or D.N.R.’s family. Furthermore, the information contained in the exhibits was not derived from the records of the juvenile court. Because § 12-15-133 is intended to protect the identity of juveniles, not DHR employees, guardians ad litem, or juvenile-court judges, we remand the cause for the juvenile court to vacate its August 20, 2012, cease-and-desist order.
2111220 — APPEAL DISMISSED.
THOMPSON, P.J., and PITTMAN and DONALDSON, JJ., concur.
MOORE, J., concurs in the result, without writing.
2120020 — APPEAL DISMISSED IN PART; JUDGMENT AFFIRMED IN PART AND REVERSED IN PART; AND CAUSE REMANDED WITH INSTRUCTIONS.
DONALDSON, J., concurs.
MOORE, J., concurs in the result, without writing.
THOMPSON, P.J., concurs in part and dissents in part, with writing, which PITTMAN, J., joins.

. The custodian is referred to as D.N.R.’s maternal aunt throughout the record; however, because we cannot determine from the record that W.R.M. (or W.R.M. and J.M.) adopted D.N.R., we cannot conclude that the *399 custodian is D.N.R.’s maternal aunt by adoption.

. Automatic-reversionary provisions regarding child-custody awards have no legal effect in Alabama. Daugherty v. Daugherty, 993 So.2d 8, 13 (Ala.Civ.App.2008).

. Although it is not entirely clear, it appears that the delinquency charge was either dismissed or that D.N.R. was found “not guilty by reason of mental defect." Similarly unclear are certain oral and written statements in various pleadings and in on-the-record discussions between attorneys and the juvenile-court judge indicating that D.N.R. suffered from a mental impairment, lower-than-average intelligence, “mild MR,” or a mental defect.

. The record contains a copy of the Pennsylvania court’s 1998 "order of consent” in which the biological mother consented to the adoption of D.N.R. and to the termination of her parental rights to D.N.R. W.R.M. is not referred to in that document.

. DHR did not file a formal brief on appeal.

. Pennsylvania has also adopted the UCCJEA. It is codified at 23 Pa. Cons.Stat. § 5401 et seq.

. Alabama Code 1975, § 30-3B-102(l 1), broadly defines "modification” as
"[a] child custody determination that changes, replaces, supersedes, or is otherwise made after a previous determination concerning the same child, whether or not it is made by the court that made the previous determination.”

. We have not overlooked the possibility that J.M. might be D.N.R.’s parent by adoption and that he might reside in Pennsylvania. However, the juvenile court was not presented with evidence indicating that J.M. had adopted D.N.R.