DONALDSON, Judge.
H.T. (“the mother”) appeals from a judgment of the Cleburne Juvenile Court (“the juvenile court”) terminating her parental rights to J.A.T. (“the child”). On appeal, the mother contends (1) that the juvenile court lacked jurisdiction over the subject matter of the petition pursuant to the Uniform Child Custody Jurisdiction Enforcement Act (“UCCJEA”), § 30-3B-101 et seq., Ala.Code 1975, (2) that the *1057 juvenile court improperly certified the judgment terminating her parental rights under Rule 54(b), Ala. R. Civ. P., and (3) that the Cleburne County Department of Human Resources (“DHR”) failed to present clear and convincing evidence to support termination of her parental rights to the child. We conclude that the juvenile court had subject-matter jurisdiction, that the judgment was properly appealable, and that sufficient evidence was presented to support the judgment terminating the mother’s parental rights. Therefore, we affirm the juvenile court’s judgment.

Facts and Procedural History

On November 27, 2013, DHR filed a petition to terminate the parental rights of the mother and J.H. (“the father”) to the child. The juvenile-court clerk assigned the petition case number JU-13-33.02. The case-action summary shows that the mother was served with process by personal service on December 9, 2013. The record does not indicate the location where the mother was served; however, her address on file with the juvenile court at that time was a street address in Fruithurst, Ala-bama (“the Fruithurst address”). The juvenile court set DHR’s petition for trial to begin on February 20, 2014. The father was not personally served with the petition,[1] and the juvenile court entered an order granting DHR’s motion to serve him by publication. The trial on the petition to terminate the mother’s parental rights began on February 20, 2014, as previously scheduled, and the juvenile court set a trial regarding the father to begin on April 24, 2014.[2]
The record contains the following facts relevant to the issues presented for review. The mother had a long history of drug abuse. She had given birth to six children, and each child had been removed from her custody. Testimony indicates that the father of the child in the present case is not the father of any of the mother’s other children. At the time of the trial, the mother’s oldest child lived with her former husband in Georgia. In April 2010, three of the mother’s children were removed from her custody by the Georgia Division of Family and Children’s Services (“GDFCS”) because of the mother’s abuse of methamphetamine, her lack of appropriate housing, and her inability to financially support the children. The three children were placed with paternal relatives. As a pai’t of that case, GDFCS offered the mother a substance-abuse assessment, drug treatment, drug screens, parenting classes, and counseling. Although the mother was initially noncompliant with GDFCS’s recommendations, she eventually entered into inpatient substance-abuse treatment in August 2010. She completed that treatment program and had negative drug screens for one year until she tested positive for methamphetamine in August 2011. Thereafter, GDFCS had difficulty contacting the mother. Testimony indicates that the mother was not able to maintain a stable residence for more than six months and that she was difficult to contact because she frequently moved between Georgia and Alabama.
On January 21, 2012, the mother gave birth to B.T. A month before B.T.’s birth, the mother tested positive for methamphetamine. Shortly after B.T.’s birth, the mother voluntarily severed her relationship with B.T. by signing documents to *1058 facilitate that child’s placement for adoption in Georgia. • On the 2012 adoption-acknowledgment forms, the mother provided the Fruithurst address as her residence.
On April 1, 2013, the mother gave birth to the child at Tanner Medical Center (“the hospital”) in Georgia. At the time of the child’s birth, both the child and the mother tested positive for amphetamines. DHR was notified and contacted the mother at the hospital. Concerning whether DHR or GDFCS would respond to the report regarding the mother and child, Jennifer Rios, a child-abuse-and-neglect investigator with DHR, testified as follows:
“[DHR’S Attorney:] ... [W]hat did you do in response to [receiving the report]?
“[Rios:] There [were] some jurisdictional issues due to the addresses provided to the hospital by [the mother], and — but we made contact with the mother at [the hospital] in Georgia.
“[DHR’S Attorney:] Going back with the jurisdictional issues. What address did [the mother] give the hospital as the address that she would be leaving with the baby and residing there if she left the hospital? Do you recall?
“[Rios:] There were — I didn’t take the call. I just remember that Calhoun County DHR was contacted with an address, but there was no verification that she actually lived there. Haralson [County] or Carroll County[, Georgia], one of the two counties in Georgia were contacted, and they did not take it. I don’t know the exact address. I know that there was one in Ohatchee[, Ala-bama]. [The mother] finally gave one in Fruithurst at her father’s, that’s how we got involved.
“[DHR’S Attorney:] She informed Cleburne County DHR that she was going to be living with her father in Frui-thurst?
“[Rios:] Yes.
“[DHR’S Attorney:] And that was in Cleburne County?
“[Rios:] That’s correct.”
Before the child’s birth, the mother had been living with the father in Georgia, but the record is not clear how long she had been living there. Testimony indicates that D.T. (“the grandfather”), the child’s maternal grandfather, resided at the Frui-thurst address. The mother reported to a DHR worker that she did not want GDFCS in Haralson County, Georgia, contacted because, the mother said, she did not have a good relationship with, that agency.
DHR obtained a pick-up order from the juvenile court and removed the child from the mother’s custody on April 3, 2013.[3] DHR brought, the child to Alabama. The record shows that a hearing was held on April 5, 2013, regarding the child and that the mother was present at the hearing. The juvenile court entered an order finding the child to be dependent on April 26, 2013. DHR initially placed the child in foster care in Cleburne County on April 3, 2013. On August 12, 2013, the child was placed with foster parents in Haralson *1059 County, Georgia, who had adopted B.T., the child’s half sibling. The child remained in the custody of the foster parents in Georgia at the time of the trial on the petition to terminate the mother’s parental rights.
. After the child was removed from the mother’s custody, DHR offered the mother various services.. An initial individualized service plan (“ISP”) formulated by DHR on April 5, 2013, with the mother present, established that the mother, in order to be reunited with the child, would be required to provide for the child’s basic needs, to obtain and maintain sobriety in order to adequately parent the child, and to provide safe and stable housing for the child.[4] DHR provided a standard-visitation schedule for the mother and the father and also directed the mother and the father to submit to a drug assessments. The visitation schedule allowed the mother and the father to visit the child up to three times a week for three hours each visit. Testimony showed that the mother visited with the child twice after the child was removed from her custody: once on April 5, 2013, and again in February 2014. On April 23, 2013, the mother was arrested on criminal charges in Haralson County, Georgia, relating to possession of drugs and fraudulent use of a credit card. She remained incarcerated until May 17, 2013, when she was sentenced and placed on probation for 10 years. After her release from incarceration, the mother had no contact with the child for the remainder of 2013. The mother contacted DHR to set up visits in May 2013 and July 2013, but she failed to attend those visits. Also, the mother failed to undergo ■ the drug assessment. She also failed to submit to several drug screens requested by DHR. The mother did not attend ISP meetings held on May 4, 2013, July 1, 2013, August 2, 2013, and November 25, 2013. The record shows the mother was incarcerated at the time of the May 4 and November 25 meetings. She attended ISP meetings on only April 12, 2013 and on August 29, 2013, which meeting was held after a court hearing.[5] The mother admitted at trial to using metham-phétamine during the pendency of the case.
The mother was arrested ágain in October 6, 2013, in Haralson County, Georgia, on charges of theft by bringing stolen property into Georgia, felony probation violation, misdemeanor probation violation, and theft by receiving stolen property. Arising from the same incident, the mother was charged with first-degree theft of property in Clay County, Alabama. The charges stemmed from her alleged involvement in the theft of a vehicle that had been transported over the state line. A certified copy of the Clay County warrant issued for the mother’s arrest that was introduced as an exhibit at trial provided the Fruithurst address for the mother.
On November 25, 2013, DHR changed the permanency plan from a plan to return custody to the mother or placement with a relative to termination of parental rights, with the permanency goal of adoption by the foster, parents. On November 27, 2013, DHR filed the petition to terminate the mother’s and the father’s parental rights.
*1060 The mother remained incarcerated in Georgia on the criminal charges until December 2013. Undisputed testimony showed that, in December 2013, the mother was ordered by the juvenile court to pay child support in the amount of $250 per month, although the order requiring that payment is not in the record. On December 20, 2013, the mother contacted DHR to report that she was entering a rehabilitation facility in Anniston. While in that facility, she became employed as a hostess at a restaurant in Anniston. Upon her employment, her wages were garnished to pay-child support. While in the rehabilitation facility, the mother was provided random drug screens once a month, and she passed three drag screens. Until her wages were garnished when she obtained employment in January 2014, the mother did not provide financially for the child. The mother also had not provided diapers, clothing, bottles, or food for the child. The mother did not give the child a Christmas present.
At the time of trial, the pending criminal cases in Georgia and in Clay County had not been adjudicated. The mother testified that she had an opportunity to participate in a drug-court program as a way to address the charges and that she intended to complete an application for admission into that program. She testified that she had a court date of March 18, 2014, to address the criminal charges. The mother testified that she had not been informed whether probation-revocation proceedings would be initiated as a result of the charges filed against her arising from the October 2013 incident.
DHR’s witnesses testified that the mother had not achieved the goal of obtaining and maintaining sobriety, although she had entered a rehabilitation facility in December 2013; that she had not achieved the goal of maintaining stable housing; and that there was no bond between the child and the mother. Testimony also indicates that DHR investigated and contacted numerous relatives for potential placement of the child. Many of the relatives whom DHR contacted lived in Alabama, including the mother’s father, who lived at the Frui-thurst address, and her sister, L.C., who lived in Ohatchee, Alabama. Testimony indicates that the father told DHR workers that he did not want the mother living on his property if she continued using drugs. According to testimony, the relatives who were contacted were determined to be unsuitable, declined to serve as placement for the child, or did not respond to inquiries.
On February 25, 2014, the juvenile court entered a judgment terminating the mother’s parental rights. The juvenile court found that mother was unable or unwilling to discharge her parental responsibilities, that she had abandoned the child, that she was unable to properly care for the child and that her condition or course of conduct was unlikely to change in the foreseeable future, that she had failed to provide for the material needs of the child or pay a reasonable portion of the child’s support, that she had failed to maintain regular visits with the child in accordance with a plan devised by DHR and agreed to by the mother, that she had failed to maintain consistent contact or communication with the child, and that she had failed to rebut the presumption that she was unable or unwilling to act as a mother due to her abandonment of the child for over four months. The mother filed a motion to alter, amend, or vacate the judgment on March 7, 2014. The juvenile court did not rule on the motion. The mother filed a notice of appeal to this court on March 21, 2014.
An affidavit of publication filed with the juvenile court on April 9, 2013, shows that *1061 the last date of publication of notice to the father occurred on April 3, 2014. DHR’s petition to terminate the father’s parental rights to the child was tried on April 24, 2014. On May 14, 2014, the juvenile court granted the petition to terminate the father’s parental rights to the child. The father has not appealed that judgment.

Analysis

I. Alleged Improper Certification of the Judgment

The mother contends that the juvenile court’s judgment terminating her parental rights is not a final order. The mother argues that the juvenile court improperly certified the judgment as final and appealable pursuant to Rule 54(b),. Ala. R. Civ. P., because the claims against her and the father in the petition were so intertwined with each other that separate adjudication would pose an unreasonable risk of inconsistent results. The juvenile court granted DHR’s petition to terminate the father’s parental rights after the mother’s notice of appeal had been filed. The mother’s argument overlooks the fact that the father had not been served with process at the time of the commencement of her trial and at the time the judgment terminating her parental rights was entered. Rule 4(f), Ala. R. Civ. P., provides:
“When there are multiple defendants and the summons (or other document to be served) and the complaint have been served on one or more, but not all, of the defendants, the plaintiff may proceed to judgment as to the defendant or defendants on whom process has been served and, if the judgment as to the defendant or defendants who have been served is final in all other respects, it shall be a final judgment. After the entry of judgment, if the plaintiff is able to obtain service on a defendant or defendants not previously served (except, however, defendants designated as fictitious parties as allowed by Rule 9(h), [Ala. R. Civ. P.,] who shall be deemed to have been dismissed voluntarily when the case was announced ready for trial against other defendants sued by their true names), the court shall hear and determine the matter as to such defendant or defendants in the same manner as if such defendant or defendants had originally been brought into court.... ”
On January 9, 2014, DHR filed a motion to serve the father by publication. On January 14, 2014, the juvenile court granted that motion and directed that the father be served with notice of the April 24, 2014, trial, by publication in The Cleburne News and in The Gateway Beacon, “a newspaper of general jurisdiction in Haralson County, Georgia.” An affidavit from the clerk of The Cleburne News dated February 13, 2014, shows that the notice to the father was last published in that newspaper on February 13, 2014. On April 9, 2014, The Gateway Beacon filed an affidavit of publication with the juvenile court, which stated that the last date of publication of the notice to the father in that paper had been April 3, 2013. See Rule 4.3(d)(4), Ala. R. Civ. P. (“Service shall be complete at the date of the last publication.”).
"The record shows that the father had not been served before the commencement of the February 20 trial and before the entry of the February 25, 2014, judgment. The father was ultimately served by publication on April 3, 2014. The juvenile court properly proceeded to trial on the claims as to the mother pursuant to Rule 4(f), Ala. R. Civ. P. Under the Alabama Rules of Civil Procedure, the February 25, 2014, judgment was final. The juvenile court’s Rule 54(b) certification of that judgment, therefore, was merely surplusage.

II. Subject Matter Jurisdiction Under the UCCJEA

The mother contends that the juvenile court did not have subject-matter *1062 jurisdiction under UCCJEA to terminate her parental rights. Subject-matter jurisdiction cannot be waived and may be challenged at any time by the parties or by the court, ex mero motu, even on appeal. K.R. v. Lauderdale Cnty. Dep’t of Human Res., 133 So.3d 396, 403-04 (Ala.Civ.App.2013). The question whether the juvenile court acquired subject-matter jurisdiction over DHR’s petition to terminate the mother’s parental rights under the UC-CJEA is a question of law; thus, our review of this issue is de novo. See Ex parte Terry, 957 So.2d 455 (Ala.2006) (a claim that a court lacks subject-matter jurisdiction presents a question of law, which an appellate court reviews de novo).
The UCCJEA is a jurisdictional act that establishes subject-matter jurisdiction over child-custody proceedings. See Ex parte M.M.T., 148 So.3d 728, 731 (Ala.Civ.App.2014)(quoting § 30-3B-201, Ala.Code 1975, Official Comment). “An Alabama ... juvenile court may not make any custody determination — neither an initial custody determination nor a determination as to modification of custody— regarding a child unless that court has ju: risdiction to make an initial custody determination under the UCCJEA....” J.D. v. Lauderdale Cnty. Dep’t of Human Res., 121 So.3d 381, 384-85 (Ala.Civ.App.2013). The UCCJEA defines a “child custody proceeding” as “[a] proceeding in a court in which legal custody, physical custody, or visitation with respect to a child is an issue.” § 30-3B-102(4), Ala.Code 1975. The term includes “proceeding[s] for ... neglect, abuse, dependency, ... paternity, [and] termination of parental .rights, ... in which the issue may appear.” § 30-3B-102(4). The UCCJEA defines an “initial determination” as “[t]he first child custody determination concerning a particular child.” § 30-3B-102(8). A “child custody determination” is defined as “[a] judgment, decree, or other order of a court providing for the legal custody, physical custody, or visitation with respect to a child. The term includes a permanent, temporary, initial, and modification order....” § 30-3B-102(3). There is no dispute that this case involves “child custody proceedings” and that the juvenile court made child-custody determinations pertaining to the child.
Section 30-3B-201(a) provides the “exclusive jurisdictional basis” for an Alabama court to ascertain whether it has subject-matter jurisdiction to make an initial child-custody determination. § 30-3B-201(b). Section 30-3B-201(a) provides:
“Except as otherwise provided in Section 30-3B-204, [Ala.Code 1975,] a court of this state has jurisdiction to make an initial child custody determination only if:
“(1) This state is the home state of the child on the date of the commencement of the proceeding, or was the home state of the child within six months before the commencement of the proceeding and the child is absent from this state but a parent or person acting as a parent continues to live in this state;
“(2) A court of another state does not have jurisdiction under subdivision (1), or a court of the home state of the child has declined to exercise jurisdiction on the ground that this state is the more appropriate forum under Section 30-3B-207 or 30-3B-208, [Ala.Code 1975,] and:
“a. The child and the child’s parents, or the child and at least one parent or a person acting as a parent, have a significant connection with this state other than mere physical presence; and
“b. Substantial evidence is available in this state concerning the *1063 child’s care, protection, training, and personal relationships;
“(3) All courts having jurisdiction under subdivision (1) or (2) have declined to exercise jurisdiction on the ground that a court of this state is the more appropriate forum to determine the custody of the child under Section 30-8B-207 or 30-3B-208; or
“(4) No court of any other state would have jurisdiction under the criteria specified in subdivision (1), (2), or (3).”
In the present case, DHR commenced child-custody proceedings by filing of a dependency petition in the juvenile court. That petition is not in the record on appeal; however, the record establishes that the child was born on April 1, 2013, that DHR removed the child from the mother’s custody on April 3, 2013, pursuant to an order entered by the juvenile court, and that the juvenile court entered an order on April 26, 2013, finding the child to be dependent. Therefore, we can presume that the dependency petition was filed between April 1, 2013, and April 3, 2013. The juvenile court’s order of April 26, 2013, constituted the initial custody determination because it was “[a] judgment, decree, or other order” concerning the child and “provid[ed] for the legal custody, physical custody, [and] visitation with respect to [the] child.” § 30-3B-102(3).
A court that makes a custody determination with jurisdiction to do so has continuing, exclusive jurisdiction under the UCCJEA to modify that determination. Section 30-3B-202, Ala.Code 1975, provides:
“(a) Except as otherwise provided in Section 30-3B-204, [Ala.Code 1975,] a court of this state which has made a child custody determination consistent with Section 30-3B-201 or Section 30-3B-203[, Ala.Code 1975,] has continuing, exclusive jurisdiction over the determination until:
“(1) A' court of this state determines that neither the child, nor the child and one parent, nor the child and a person acting as a parent have a significant connection with this state and that substantial evidence is no longer available in this state concerning the child’s care, protection, training, and personal relationships; or
“(2) A court of this state or a court of another state determines that .the child, the child’s parents, and any person acting as a parent do not presently reside in this state.
“(b) A court of this state which has made a child custody determination and does not have continuing, exclusive jurisdiction under this section may modify that determination only if it has jurisdiction to make an initial determination under Section 30-3B-201.”
In order for this court to determine whether the juvenile court properly exercised continuing jurisdiction over the child and, thus, jurisdiction to terminate the mother’s parental rights, “the [juvenile] court must have had jurisdiction to make an initial custody determination.” Patrick v. Williams, 952 So.2d 1131, 1138 (Ala.Civ.App.2006).
The mother first challenges the juvenile court’s judgment on the basis that Alabama lacked “home state” jurisdiction over the child pursuant to § 30-3B-201(a)(1). She contends that Georgia was the child’s home state at the time of the filing of the dependency petition. Thus, she contends, the juvenile court lacked subject-matter jurisdiction under the UC-CJEA to make the initial determination of dependency and, in turn, lacked continuing jurisdiction to terminate her parental rights to the child.
*1064 The UCCJEA defines a child’s “home state” as:
“The state in which a child lived with a parent or a person acting as a parent for at least six consecutive months immediately before the commencement of a child custody proceeding. In the case of a child less than six months of age, the term means the state in which the child lived from birth with any of the persons mentioned. A period of temporary absence of the child or any of the mentioned persons is part of the period.”
§ 30-3B-102(7), Ala.Code 1975 (emphasis added). The child was less than six months of age when the dependency petition was filed, and the child had been physically present in Georgia since birth; thus, we must analyze whether the child “lived from birth with” the parent or a person acting as a parent in the State of Georgia. § 30-3B-102(7). The mother asserts that she and the child resided at the hospital in Georgia between April 1, 2013, until April 3, 2013, when DHR removed the child from her custody. She argues that, by virtue of the limited stay in the hospital following the child’s delivery, the child had “lived from birth” with her in Georgia. She contends that the undisputed evidence regarding this temporary hospital stay in Georgia demonstrates that Georgia is the child’s “home state” and that the juvenile court therefore could not have exercised subject-matter jurisdiction over the dependency petition or continuing jurisdiction over the petition to terminate the mother’s parental rights.
In addressing the mother’s argument, we must apply the rules of statutory construction to ascertain the meaning of the phrase “lived from birth,” as it appears in § 30-3B-102(7), and to determine whether that phrase is ambiguous. The “[principles of statutory construction instruct [a court] to interpret the plain language of a statute to mean exactly what it says and to engage in judicial construction only if the language in the statute is ambiguous.” Ex parte Pratt, 815 So.2d 532, 535 (Ala.2001).
“We have said that a statute is ambiguous when it is of doubtful meaning. Ex parte Alabama Public Service Commission, 268 Ala. 322, 106 So.2d 158 (1959). Ambiguity in this sense has been defined as whether ‘A statute or portion thereof is ambiguous when it is capable of being understood by reasonably well-informed persons in either of two or more senses.... ’ State ex rel. Neelen v. Lucas, 24 Wis.2d 262, 267, 128 N.W.2d 425, 428 (1964).”
S & S Distrib. Co. v. Town of New Hope, 334 So.2d 905, 907 (Ala.1976). As argued by the mother; “the state in which the child lived from birth with” a parent could mean the state where the mother gave birth to the child and where the mother and the newborn child remained in the hospital before being discharged. However, the phrase could also mean more than physical presence in the hospital where the child was born and require some indicia of a presence in the state such as, for example, occupying a residence together. Because the statute is susceptible to more than one meaning, we determine that it is ambiguous, and, therefore, we must ascertain the meaning of the phrase “lived from birth.”
We find persuasive the Supreme Court of Illinois’s analysis of an identical statute, 750 Ill. Comp. Stat. 36/102(7), in In re D.S., 217 Ill.2d 306, 840 N.E.2d 1216, 298 Ill.Dec. 781 (2005). In In re D.S., the mother had a history of involvement with the Illinois Department of Children and Family Services. Six of her children had been declared wards of the State of Illinois. During her pregnancy with the child at issue, the mother left Illinois with the *1065 intention of relocating permanently to Tennessee. While en route to Tennessee, the mother gave birth to the child in a hospital in Indiana. After being informed of the birth of the child, the State of Illinois commenced dependency proceedings in an Illinois court to declare the mother unfit to care for the child. At the time the proceedings were commenced, the child remained in the hospital in Indiana. Following a dispositional hearing, the Illinois trial court granted custody of the child to the State of Illinois. On appeal, the mother argued that the Illinois trial court lacked subject-matter jurisdiction to make an initial custody determination because, she argued, Indiana was the child’s home state because that is where the child had “lived from birth” with the mother. In interpreting the meaning of the phrase “lived from birth”, the Supreme Court of Illinois stated:
“Section 102(7) defines a newborn’s home state as the state in which he or she has ‘lived from birth’ with his or her parents. The crucial question, of course, is what did the drafters of the UCCJEA mean by ‘live,’ a verb that can mean many different things depending upon the context. Did they mean, as respondents seem to suggest, nothing more than ‘to be alive’? See Webster’s Third New International Dictionary 1323 (1993). That, for purposes of the UCCJEA, a child ‘lives’ in every jurisdiction in which he or she draws a breath? Or did they mean, as the case law teaches, something more like ‘to occupy a home’? See Webster’s Third New International Dictionary 1323 (1993). We are convinced that they meant the latter.”
In re D.S., 217 Ill.2d at 317, 840 N.E.2d at 1222, 298 Ill.Dec. at 787.
After a thorough analysis of other jurisdictions’ interpretation of identical provisions of the UCCJEA, the Supreme Court of Illinois concluded in In re D.S. that,
“[b]y itself, a temporary hospital stay incident to delivery is simply insufficient to confer ‘home state’ jurisdiction under the UCCJEA.... When people speak of where a mother and newborn baby ‘live,’ they do not speak of the maternity ward. Instead, they speak of the place to which the mother and baby return following discharge from the hospital.”
217 Ill.2d at 317, 840 N.E.2d at 1222, 298 Ill.Dec. at 787. Thus, that court held that Indiana was not the child’s home state. Further, the court held that the parties in that case had failed to show that any other state possessed “home state” jurisdiction over the child when the proceedings had commenced. Therefore, the child lacked a “home state” for UCCJEA purposes. 217 Ill.2d at 319, 840 N.E.2d at 1223, 298 Ill. Dec. at 789. See also In re Interest of Violet T., 286 Neb. 949, 955, 840 N.W.2d 459, 464 (2013) (Supreme Court of Nebraska determined that the trial court lacked subject-matter jurisdiction under the UCCJEA over a proceeding involving protective custody of a child when, apart from a few days in a hospital following her birth, the child had never lived in Nebraska).
We agree with the Supreme Court of Illinois’s construction of the statute and determine that the drafters of the UC-CJEA intended “lived from birth” to mean where a child, with a parent or a person acting as a parent, has a presence — beyond simply a hospital stay attendant to giving birth in a state — such as residing within or occupying a home together.
We conclude that a limited hospital stay in a state following birth, without more, is insufficient to establish a home state for the child as that term is defined by § 30-3B-102(7). Thus, we disagree with the mother’s contention that Georgia was the child’s home state by virtue of the two-day *1066 hospital stay following the child’s April 1, 2013, birth. The mother argues that the evidence shows that she had been living with the father in Georgia before the child’s birth, but testimony also indicates that the mother initially informed DHR that she planned on residing with the child at the Fruithurst address upon leaving the hospital. She not only provided DHR- the Fruithurst address, but the mother 'also provided that address as her residence on every document in the record on which she was directed to provide an address. Further, testimony also shows that the mother, before the child’s birth, frequently moved between Alabama and Georgia. For the foregoing reasons, we cannot conclude that the juvenile court was required to find that the child “livéd from birth” with the mother or any person serving as a parent in Georgia.
Likewise, we cannot conclude that the child lived in Alabama from birth with a parent or a person acting as her parent at the time the dependency petition was filed. Although the evidence could establish that the mother intended to live in Alabama with the child after the child’s birth, the child had not lived from birth in Alabama at the time of the commencement of the dependency proceedings. Thus, the child did not have a home state as defined by the UCCJEA. See, e.g., J.H. v. C.Y., 161 So.3d 233, 238 (Ala.Civ.App.2014) (holding that a child lacked a home state under the UCCJEA). Because neither Alabama, nor Georgia, nor any other state qualified as the child’s home state at the commencement of the proceedings in the juvenile court, the juvenile court could not have properly exercised jurisdiction under § 30-3B-201(a)(1).
We next turn- to the question whether the juvenile court had- subject-matter jurisdiction over this' case under § 30-3B-201(a)(2). That section requires there to be a significant connection between the state and.the child and at least one parent, as well as the availability of substantial evidence in the state relevant to the child-custody determination. The Official Comment to § 30-3B-201 suggests that under subsection (a)(2), “[t]he jurisdictional determination should be made by determining whether there is sufficient evidence in the state for the court to make an informed custody determination. That evidence might relate to the past as well as to the ‘present and future.’” This court has previously recognized that
“ ‘[s]ome factors that- have been weighed in these cases are the child’s relationship with extended or blended family members, enrollment in school or day care, participation' in social activities, access to medical, dental, or psychological care, or the availability of government assistance. Some courts will mention the parent’s employment or family ties.’
“Claudia G. Catalano, Annotation, Construction and Application of Uniform, Child Custody Jurisdiction and Enforcement Act’s Significant Connection Jurisdiction Provision, 52 A.L.R.6th 433, § 2, p. 453 (2010). See also Baker v. Baker, 25 So.3d 470, 474 (Ala.Civ.App.2009) (discussing the requirement of a ‘significant connection’ along with evidence of ‘care, protection, training, and personal relationships’ under § 30-3B-201(a)(2)).”
J.H. v. C.Y., 161 So.3d at 238. The child was only few days old at the commencement of the dependency proceedings, and an assessment of significant past connections the child had to Alabama cannot be made. However,, the evidence establishes that the mother had past, present, and future connections in Alabama and that the child had present and future connections with this state. Perhaps the'most signifi *1067 cant connection to this state is the mother’s repeated use of the Fruithurst address as her residence on official forms and her insistence to DHR that she intended to live at that address with the child after leaving the hospital. Further, undisputed testimony indicates that the mother frequently moved between Alabama and Georgia. Despite testimony indicating that the mother had been living in Georgia immediately before the child’s birth, the juvenile court was not required to find from that evidence that she was a resident of Georgia. The mother also asserts that the child resided in Georgia with the foster parents at the time of the trial; however, that does not alter the conclusion that the child lacked a home state at the time the dependency proceedings were commenced or mandate a conclusion that the child did not have significant contacts with Ala-bama. Furthermore, we note that the mother, at the time of trial, was residing in Anniston, where she was employed. We determine that there is sufficient evidence to establish that the mother’s and the child’s connections to Alabama were significant for purposes of satisfying 30-3B-201(a)(2)a.
We also note that the record contains abundant testimony “concerning the child’s care, protection, training, and personal relationships” in Alabama to satisfy the requirements of § 30-3B-201(a)(2)b. For example, the child was initially placed in foster care in Alabama, the child received medical treatment in Alabama, the child received Special Supplemental Food Program for Women, Infants, and Children benefits through the Cleburne County Health Department, and the child had relatives in Alabama.
For the foregoing reasons, we conclude that the juvenile court had subject-matter jurisdiction over the case under § 30-3B-201(a)(2). Because the juvenile court properly exercised jurisdiction over the dependency case, the juvenile court had continuing, exclusive jurisdiction to enter the judgment to terminate the mother’s parental rights.

III. Termination of Parental Rights

The mother next contends that the juvenile court lacked clear and convincing evidence to determine that the mother had abandoned the child, that the conduct of the mother was unlikely to change in the foreseeable future, and that no viable alternatives to termination existed.
“ ‘A juvenile court is required to apply a two-pronged test in determining whether to terminate parental rights: (1) clear and convincing evidence must support a finding that the child is dependent; and (2) the court must properly consider and reject all viable alternatives to a termination of parental rights. Ex parte Beasley, 564 So.2d 950, 954 (Ala.1990).’
“B.M. v. State, 895 So.2d 319, 331 (Ala.Civ.App.2004). A juvenile court’s judgment terminating parental rights must be supported by clear and convincing evidence. Bowman v. State Dep’t of Human Res., 534 So.2d 304, 305 (Ala.Civ.App.1988). ‘ “Clear and convincing evidence” ’ is ‘ “[e]vidence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion.”’ L.M. v. D.D.F., 840 So.2d 171, 179 (Ala.Civ.App.2002) (quoting Ala. Code 1975, § 6-11-20(b)(4)). The juvenile court’s factual findings in a judgment terminating parental'rights based on evidence presented ore ténus are presumed correct. R.B. v. State Dep’t of Human Res., 669 So.2d 187 (Ala.Civ.App.1995). Furthermore, when the juvenile court has not made specific factu *1068 al findings in support of its judgment, we must presume that the juvenile court made those findings necessary to support its judgment, provided that those findings are supported by the evidence. D.M. v. Walker County Dep’t of Human Res., 919 So.2d 1197, 1210 (Ala.Civ.App.2005).”
A.E.T. v. Limestone Cnty. Dep’t of Human Res., 49 So.3d 1212, 1216 (Ala.Civ.App.2010).[6]
Section 12-15-319, Ala.Code 1975, provides, in pertinent part:
“(a) If the juvenile court finds from clear and convincing evidence, competent, material, and relevant in nature, that the parents of a child are unable or unwilling to discharge their responsibilities to and for the child, or that the conduct or condition of the parents renders them unable to properly care for the child and that the conduct or condition is unlikely to change in the foreseeable future, it may terminate the parental rights of the parents. In determining whether or not the parents are unable or unwilling to discharge their responsibilities to and for the child and to terminate the parental rights,- the juvenile court shall consider the following factors including, but not limited to, the following:
“(1) That the parents have abandoned the child, provided that in these cases, proof shall not be required of reasonable efforts to prevent removal or reunite the child with the parents.
“(2) Emotional illness, mental illness, or mental deficiency of the parent, or excessive use of alcohol or controlled substances, of a duration or nature as to render the parent unable to care for needs of the child.
[[Image here]]
“(4) Conviction of and imprisonment for a felony.
[[Image here]]
“(7) That reasonable efforts by the Department of Human Resources or licensed public or private child care agencies leading toward the rehabilitation of the parents have failed.
[[Image here]]
“(9) Failure by the parents to provide for the material needs of the child or to pay a reasonable portion of support of the child, where the parent is able to do so.
“(10) Failure by the parents to maintain regular visits with the child in accordance with a plan devised by the Department of Human Resources, or any public or licensed private child care agency, and agreed to by the parent.
“(11) Failure by the parents to maintain consistent contact or communication with the child.
“(12) Lack of effort by the parent to adjust his or her circumstances to meet the needs of the child in accordance with agreements reached, including agreements reached with local departments of human resources or licensed child-placing agencies, in an administrative review or a judicial review.”
Section 12-15-301(2), Ala.Code 1975, defines “abandonment” as:
“A voluntary and intentional relinquishment of the custody of a child by a parent, or a withholding from the child, without good cause or excuse, by the parent, of his or her presence, care, love, *1069 protection, maintenance, or the opportunity for the display of filial affection, or the failure to claim the rights of a parent, or failure to perform the duties of a parent.”
In R.S. v. R.G., 995 So.2d 893 (Ala.Civ.App.2008), Judge Moore stated that § 12-15-301
“set[s] out multiple, alternative grounds upon which a juvenile court may find that a parent has abandoned a child. See J.L. v. State Dep’t of Human Res., 961 So.2d 839, 848-49 (Ala.Civ.App.2007). However, all these grounds share at least one common characteristic — they are all directed at the failure of the parent to assume and exercise his or her parental rights and duties in relation to the child.”
995 So.2d at 904 (Moore, J., concurring in the result). Pursuant to § 12-15-319(b), “[a] rebuttable presumption that the parents are unable or unwilling to act as parents exists in any case where the parents have abandoned a child and this abandonment continues for a period of four months next preceding the filing of the petition.”
Although the mother had an opportunity under the visitation schedule to visit with the child for three hours three times a week when she was not incarcerated, the mother visited the child only one time, in April 2013, before the filing of the petition to terminate her parental rights. The mother took the initiative on two occasions to contact DHR to set up visits, but then she failed to show up for the visits. On cross-examination, the mother testified as to the reason she did not visit with the child during the period that she had not been incarcerated:
“[DHR’S Attorney:] Between May of 2013 when you were released from jail until October, when you went back [to jail], why didn’t you visit [the child]?
“[The Mother:] I was strung out on drugs. That’s why.”
The evidence would support findings that, for a period exceeding four months before the filing of the petition, the mother failed to provide any meaningful support for the child, never claimed parental rights to the child, never attempted to establish a bond with the child, never discharged any parental duties for the child, and failed to provide the child with any meaningful support. Stated otherwise, the mother’s inaction and refusal to visit, contact, support, or have any relationship with the child supports the juvenile court’s determination 'that she had abandoned the child and that the abandonment of the child represented an unwillingness of the mother to discharge her responsibilities for the child.
The mother next contends that the juvenile court was without clear and convincing evidence to support a finding that she was unable to properly care for the child and that her condition or course of conduct is unlikely to change. DHR presented the juvenile court with evidence from which the juvenile court could have found that the mother’s use of controlled substances was excessive and “of a duration or nature as to render her unable to care for needs of the child.” § 12-15-319(a)(3). By the mother’s own admission at trial, she continued to abuse methamphetamine after DHR removed the child from her custody. The mother points to testimony indicating that she entered a rehabilitation facility in December 2013 and that she had made progress in the program by passing three drug screens between December 2013 and February 2014. The mother’s recent attempt at rehabilitation is commendable. We note, however, that, in 2010, the mother had participated in a rehabilitation program and had even maintained sobriety for a year; however, her efforts then were not *1070 successful and the mother reverted to drug use. As this court has previously recognized, the juvenile court “ ‘may consider the past history of the family as well as the evidence pertaining to current conditions.’ ” A.R. v. State Dep’t of Human Res., 992 So.2d 748, 760 (Ala.Civ.App.2008) (quoting T.B. v. Lauderdale Cnty. Dep’t of Human Res., 920 So.2d 565, 570 (Ala.Civ.App.2005)). Additionally, the juvenile court was within its discretion to determine that, “to the extent the mother may have allegedly improved her condition, those efforts were merely last-minute efforts undertaken in anticipation of the impending termination-of-parental-rights trial.” A.M.F. v. Tuscaloosa Cnty. Dep’t of Human Res., 75 So.3d 1206, 1213 (Ala.Civ.App.2011) (citing J.D. v. Cherokee Cnty. Dep’t of Human Res., 858 So.2d 274, 277 (Ala.Civ.App.2003)).
Finally, the mother contends that the juvenile court erroneously determined that there were no viable alternatives to the termination of her parental rights. The mother, on appeal, fails to provide this court with any reference to any alternative the juvenile court could have considered, except to state that the father had been a viable alternative at the time of the entry of the judgment terminating her parental rights because the court had not adjudicated the petition as to him. DHR investigated and contacted numerous relatives for placement of the child, many of whom lived in Alabama. Testimony shows that the relatives contacted either expressed an unwillingness to serve as a potential placement, failed to respond to DHR’s inquiries, or were determined by DHR to be unsuitable for-placement. The mother does not direct us to any evidence indicating that the father, whose rights to the child were also terminated, was a viable alternative. Thus, the juvenile court’s determination that there were no viable alternatives to termination of the mother’s parental rights is supported by the evidence.
Based on the applicable standard of appellate review that governs our consideration of this case, the evidence reasonably could have produced in the mind of the juvenile court a firm conviction as to each essential element of DHR’s claims and a high probability as to the correctness of its conclusion that the child’s best interests would be served by the termination of the mother’s parental rights. We, therefore, affirm the judgment of the juvenile court.
AFFIRMED.
PITTMAN and THOMAS, JJ., concur.
THOMPSON, P.J., and MOORE; J., concur in the result, without writings.

. The return of service for the father shows that the process server was directed to serve the father at a Buchanan, Georgia, address. On the return, the process server noted that the father was ”[n]o longer at this address.”

. The father has not appealed the juvenile court's judgment terminating his parental rights. Only the testimony of the February 20, 2014, trial appears in the record.

. The record does not indicate in what manner the juvenile court’s pick-up order was enforced in Georgia; however, Georgia has adopted the UCCJEA. See Ga.Code. Ann., § 19-9-40 et seq. The UCCJEA provides that
"a court of this state shall accord full faith and credit to an order issued by another state and consistent with this article which enforces a child custody determination by a court of another state unless the order has been vacated, stayed, or modified by a court having jurisdiction to do so under Part 2 of this article.”
Ga.Code. Ann., § 19-9-93. See also § 30-3B-313, Ala.Code 1975.

. A registration list of attendees for the April 5, 2013, ISP meeting shows that the mother provided the< Fruithurst address as her residence. The ISP records also indicate that the Fruithurst address was listed as the address for the mother on the front page of the initial report made to DHR.

. The notes for the August 29, 2013, ISP meeting show that the mother provided the Fruithurst address as her address.

. See also Ex parte McInish, 47 So.3d 767 (Ala.2008) (explaining the standard of review to be used in evaluating whether the clear- and-convincing-evidence burden of proof has been met).