BRYAN, Judge.
On January 18, 2008, the Alabama Department of Human Resources, acting through the St. Clair County Department of Human Resources (“DHR”), filed a petition to terminate the parental rights of D.F.H. (“the father”) and Kr.H. (“the mother”) to three of their four children: K.H., a girl born in August 1991; A.H., a girl born in January 1994; and C.H., a boy born in July 1996 (K.H., A.H., and C.H. are collectively referred to hereinafter as “the children”).[1]
The juvenile court conducted an ore ten-us hearing on DHR’s petition to terminate the parental rights of the mother and the father on August 5 and 6, 2009. On Au *1083 gust 6, 2009, Ja.K., a paternal aunt of the children (“the aunt”), and Jo.K, her husband (“the uncle”), filed a petition to intervene in the termination action filed by DHR. The aunt and the uncle, who reside in the State of Illinois, requested custody of the children, and they alleged that a home study of their home had been conducted and approved through the Interstate Compact on the Placement of Children (“the ICPC”).
The juvenile court entered a judgment on August 25, 2009, that terminated the parental rights of the mother and the father to the children. The juvenile court made several specific findings of fact, including a finding that the aunt and the uncle were not viable relative resources for the placement of the children, and it denied their petition to intervene in the termination proceedings. In paragraph 15 of its final judgment, the juvenile court found, in pertinent part, that “the State of Alabama has made all reasonable efforts to reunite the child[ren] with the [mother and the father] and [that] the reasonable efforts by [DHR] leading toward the rehabilitation of the relationship between the parents and [the] children] and placement with other persons or relatives have failed.” On September 3, 2009, the father filed a motion to alter, amend, or vacate the judgment or, in the alternative, a motion for a new trial, pursuant to Rule 59, Ala. R. Civ. P. The father’s postjudgment motion was denied by operation of law. See Rule 1(B), Ala. R. Juv. P.[2] Only the father has appealed the juvenile court’s August 25, 2009, judgment.

Issues

On appeal, the father raises two issues for this court’s review: (1) whether the juvenile court erred by concluding that no viable alternatives to termination of the father’s parental rights existed, and (2) whether the juvenile court’s specific finding of fact contained in paragraph 15 of the final judgment was clearly erroneous.
Facts[3]
At the time of the final hearing, C.H. was 13 years old, A.H. was 15 years old, and K.H. was almost 18 years old. Jean Fain, a DHR caseworker, testified that she began working with the children in December 2007. The father was incarcerated at that time, but DHR was actively offering rehabilitative services to the mother in order to facilitate family reunification. The children had been in foster care since November 2006, and Fain stated that by December 2007 the children had been in several different foster-care placements. In November 2007, D.J.H., the oldest child of the mother and the father, C.H., and A.H. were placed in the home of K.C. and P.C. (“the foster parents”). K.H. was moved to the home of the foster parents to join D.J.H., C.H., and A.H. in February 2008.[4]
Teresa Mullinax, a licensed counselor, testified that she had started counseling *1084 A.H. and C.H. in January 2007 and that A.H. and C.H. were in foster care at a Baptist’s Children’s Home at that time. According to Mullinax, C.H. needed counseling because he would not eat, he was depressed, and he had expressed that he did not want to live. C.H. was moved from the Baptist Children’s Home to another foster home before he was moved to the foster parents’ home in November 2007. Mullinax counseled C.H. again after he moved into the foster parents’ home, and she noticed that C.H. appeared well-adjusted and content in the foster parents’ home. Mullinax subsequently terminated counseling with C.H. because of the progress he had made. Mullinax stated that A.H. had also adjusted well to living with the foster parents. Mullinax did not meet K.H. until she was placed in the foster parents’ home in February 2008. Mullinax stated that K.H. appeared “very adjusted” in the foster parents’ home and that she appeared to have a bond with the foster parents.
Fain stated that DHR had investigated possible relative resources as an alternative to terminating the father’s parental rights. Before the termination-of-parental-rights petition was filed in January 2008, DHR investigated a maternal uncle of the children who lived in Texas through the ICPC. However, his home study was not approved by the Texas Department of Family and Protective Services. DHR contacted the paternal grandmother of the children, who also lived in Texas, but, according to Fain, she declined to take custody of the children. DHR also requested a home study of the father’s residence in Texas through the ICPC, but a home study could not be completed because the father was “in and out” of prison throughout the time the children were in the custody of DHR.
The aunt testified that her mother, the paternal grandmother of the children, had informed her in January or February 2008 that the children were in the custody of DHR. According to the aunt, her family had not known where the children were living for six years preceding January or February 2008. In response to the aunt’s interest in taking custody of the children, DHR requested a home study of the aunt and the uncle’s home through the ICPC. Lutheran Child and Family Services of Illinois completed a study of the aunt and the uncle’s home in April 2008 (“the Illinois report”), and, on July 2, 2008, DHR received a copy of the Illinois report, which approved the aunt and the uncle for custody of the children.
Fain stated that soon after the aunt expressed interest in taking custody of the children, she discussed with the children, including D.J.H., who was 18 years old at that time, the possibility that they could go live with the aunt. Fain testified that the children, whose ages were approximately 16, 14, and 12 years old at that time, were confused about who the aunt was. Fain asked the children individually about their desire to live with the aunt because, Fain stated, they were old enough to express their opinion on the matter. Fain stated that the children had indicated to her that they did not want to live with the aunt. Fain asked the children to write a letter expressing their opinions.
In a letter dated February 15, 2008, A.H. stated that she loved the father and the aunt, that she would be willing to talk to the aunt on the telephone, but that she did not want to live with the father or with the aunt.[5] In his letter, C.H. stated that *1085 he did not want to live with the father or with the aunt, and he indicated that he did not want telephone contact with either the father or the aunt. K.H., in her letter, stated that she did not want to live with the aunt, that she did not want to live with the father, that she did not want to live with any of the father’s relatives, that she hated “all of them,” and that they were “bad people.” K.H. also specified, “no phone calls” in her letter.[6] The children told Fain that if they were placed in the custody of the aunt, they would run away.[7]
The Illinois report recommended that communication be established between the children and the aunt and the uncle and that the children should be allowed to visit the aunt and the uncle. The Illinois report also stated: “It is imperative that the children be allowed to voice their desires because of their ages. Their willingness to live with their aunt is key to the success of such a placement.” Fain stated that she had provided the aunt’s contact information to A.H. because she had expressed a desire to communicate with the aunt. According to Fain, the aunt’s mailing address and telephone number were kept on the refrigerator at the foster parents’ home so that the children had access to that information if they wanted it. Fain stated that DHR did not prohibit the children from contacting the aunt and the uncle, but, according to Fain, the children refused to contact the aunt and the uncle because, in Fain’s words, “they wanted nothing at all to do with these people.” Considering the ages of the children, Fain stated that DHR could not force the children to have a relationship with the aunt, and she described the children as “relatively uninflu-enceable [sic]” and “very outspoken.”
Fain stated that the children’s letters confirmed her earlier discussions with the children that the children did not want to live with the aunt. Fain stated that she did not recommend the aunt and the uncle as relative resources for the children because the children were unwilling to communicate with the aunt, because the children did not want to live with the aunt, because the children were stable in their current foster home, and because she believed that a change in their environment, especially an unwanted change, would be detrimental to the children.
Mullinax stated that the children recognized that the mother, who they desired to live with, was unable to care for them and that they had expressed their desire to stay with the foster parents. The children occasionally expressed anger toward DHR, and A.H. thought that DHR had been “unfair” to the mother. Mullinax stated that she had discussed with the children the possibility of them living with the aunt and that, according to Mullinax, the children had expressed to her that they did not want to live with the aunt. Mullinax agreed that the children were “hard to lead into any direction,” and she described them as “strong-willed.” Mullinax also stated that she had discussed the termination proceedings with the children, and she stated that the children “were ready for a decision to be made so ... that they would [not] be in limbo.”
*1086 The aunt requested visitation and contact with the children, and DHR permitted her to contact the children via a telephone conference during an Individualized Service Plan (“ISP”) meeting held in the summer of 2008. According to Fain, the ages of the children qualified them to participate in the team that made decisions about their future. Fain stated that her supervisor, considering the opinions expressed by the children and input from Fain, decided in August 2008 that the aunt and the uncle would not be pursued as relative resources for the children. The reasons behind that decision were that the children were unwilling to communicate with the aunt and the uncle, that DHR could not force the children to have contact with the aunt and the uncle, that the children were unwilling to relocate to Illinois, and that the children threatened to run away if DHR forced them to move. Fain stated that the permanent plan for the children was adoption. Apparently, DHR originally planned to pursue adoption only for C.H., who was the youngest of the children, but K.H. and A.H. also expressed their desire to be adopted.
Fain filed a report on February 27, 2008, approximately two weeks after K.H. had been moved to the foster parents’ home, that stated that the children needed stability and that the foster parents’ home provided stability for the children. Fain denied that DHR had decided in February 2008 that the aunt and the uncle would not be pursued as a viable alternative to termination, and Fain denied that the Illinois report was a waste of time, despite the fact that the children had indicated them unwillingness to live with the aunt before the date that the home study was performed.
C.H. testified that he did not know about the aunt until his foster parents told him about her. He stated that he had had access to a telephone at the foster parents’ home and that his foster parents had told him that he could call the aunt if he desired. C.H. said that he did not know if he had ever seen the aunt before, and he stated that he would not recognize the aunt if he saw her. C.H. testified that he was happy in the foster parents’ home, that he wanted to stay with the foster parents, and that he would rather be adopted than go live with the aunt. He said that DHR had given him the choice of going to live with the aunt or staying in foster care with the foster parents. He said that no one had told him any details about the aunt and the uncle and that no one had encouraged him to call the aunt and the uncle. He stated that he wrote the letter expressing his opinion about going to live with the aunt while he was by himself in his room.
A.H. testified that she was content in the foster parents’ home, that she did not want to move again, that she had heard of the aunt, but that she did not know her or remember her. A.H. testified that she did not want the aunt’s telephone number because she did not know her and that she did not want to communicate with anyone on the father’s side of the family. She stated that the only reason she had indicated in her letter that she wanted to communicate with the aunt was so that the aunt’s feelings would not be hurt. A.H. thought that the aunt might return the children to the father after he was released from prison. A.H. stated that she chose not to call the aunt, that she did not want to see the aunt, and that she wanted to stay with the foster parents. She said that she was never discouraged from calling the aunt, that she had been asked if she wanted to contact the aunt, and that she had been asked to consider visiting the aunt and the uncle.
K.H. testified that she had been raped by an uncle and molested by the father when she was four or five years old. She *1087 stated that she thought that the aunt and the uncle would let the father see her, and she did not want to see the father. She said that she liked living with the foster parents and that she wanted to stay there. K.H. stated that she would choose adoption over going to live with the aunt and the uncle because she loved the foster parents and she did not know or remember the aunt and the uncle. She said that nothing could change her mind about going to live with the aunt and the uncle. K.H.’s testimony indicated that the paternal grandmother was aware that the children were in DHR custody in Alabama in January 2007, not January or February 2008, as the aunt had testified. K.H. did not remember the aunt’s telephone number being posted on the foster parents’ refrigerator, but she stated that she was told that she could call the aunt anytime she desired. K.H. was also told that it would be a good idea to talk to the aunt and the uncle to see what they were like.
The aunt testified that, at the time of the final hearing, she and the uncle lived in Illinois in a 5-bedroom, 3-bathroom home, that they had been married for 33 years, and that the uncle was a Senior Staff Sergeant in the United States Air Force. Neither the aunt nor the uncle have a criminal record. According to the aunt, once she learned the location of the children, she immediately contacted Fain to express her willingness to take custody of the children. However, she stated that Fain had basically told her that the fact that she had called did not mean anything and that DHR was proceeding with what had already been planned for the children. The aunt stated that she had not seen the children since the summer of 1997, or approximately 12 years before the final hearing.
The aunt testified regarding four recommendations contained in the Illinois report. Those recommendations were: (1) to establish communication between the children and the aunt and the uncle; (2) to allow the aunt and the uncle to travel to meet the children because there had been an extended period with no contact; (3) to allow the children to visit the aunt and the uncle in their home; and (4) to allow the aunt and the uncle access to psychological and school reports before placing the children with them to assist in appropriate services. The Illinois report further stated that, “[a]fter communications have been established and this extended family has been reunited, placement with them be made with input from the children.” The aunt testified that none of the recommendations in the Illinois report were allowed to happen, and she alleged that she was told by DHR that the children could not leave the State of Alabama. The aunt stated that she had asked for a telephone number to call the children but that DHR had refused to provide her the children’s telephone number. She also stated that DHR had refused to provide her telephone number to the children. The aunt admitted that the Illinois report also stated that the children’s “willingness to live with [the] aunt [wa]s key to the substance of such placement,” but she stated her belief that the children were “coaxed” into writing the February 2008 letters that stated that they did not want to live with her.
The father’s answer to DHR’s petition to terminate his parental rights was read into the record, and he stated, in part: “[M]y sister who resides in the State of Illinois expresses her willingness to become temporary managing conservator of [the] children.” However, the aunt testified that the father knows that she will have custody of the children and that he would not be allowed to see the children. The aunt testified that she had not seen the father since 2002 and that she had no plans to return custody of the children to the father, who, according to the aunt, was set to *1088 be released from prison in September 2009.
The aunt stated that she had read in a family study that K.H. had accused the father of sexually abusing her as a child, but she stated that the abuse of K.H. was done by the mother’s brother and not by the father. The aunt stated that she did not want to uproot the children, but she thought that the children should be with their family. The uncle testified that he supported the aunt’s decision to take custody of the children, and he reiterated that the children would be well taken care of in their home.

Discussion

“A juvenile court is required to apply a two-pronged test in determining whether to terminate parental rights: (1) clear and convincing evidence must support a finding that the child is dependent; and (2) the court must properly consider and reject all viable alternatives to a termination of parental rights. Ex parte Beasley, 564 So.2d 950, 954 (Ala.1990).”
B.M. v. State, 895 So.2d 319, 331 (Ala.Civ.App.2004).
On appeal, the father concedes that the children were dependent at the time of the final hearing. The father argues, however, that DHR did not present clear and convincing evidence that there were no viable alternatives to the termination of his parental rights. This court’s standard of reviewing such determinations is well settled.
“The determination of whether a viable alternative to termination of parental rights exists is a question of fact to be decided by the juvenile court. See Ex parte J.R., 896 So.2d 416 (Ala.2004). On appeal from ore tenus proceedings in a termination-of-parental-rights case, this court presumes that the juvenile court’s factual findings regarding viable alternatives are correct. See J.C. v. State Dep’t of Human Res., 986 So.2d 1172, 1183 (Ala.Civ.App.2007). However, because of the serious nature of a judgment severing a familial relationship, see L.M. v. D.D.F., 840 So.2d 171, 179 (Ala.Civ.App.2002), this court conducts a ‘careful search of the record’ to determine whether such findings are supported by clear and convincing evidence. In re Moore, 470 So.2d 1269, 1270 (Ala.Civ.App.1985). See also Columbus v. State Dep’t of Human Res., 523 So.2d 419, 421 (Ala.Civ.App.1987); and Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). ‘Clear and convincing evidence’ is ‘ “[ejvidence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion.” ’ L.M. v. D.D.F., 840 So.2d at 179, citing in turn Ala.Code 1975, § 6 — 11—20 (b) (4).”
J.B. v. Cleburne County Dep’t of Human Res., 991 So.2d 273, 282 (Ala.Civ.App.2008).
Alabama Code 1975, former § 12-15-71(a)(3)c.,[8] which was applicable to this case, provided that a juvenile court may transfer legal custody of a child determined to be dependent to “[a] relative or other individual who, after study by the Department of Human Resources, is found by the court to be qualified to receive and *1089 care for the child.” In termination-of-parental-rights cases, our supreme court has held that ‘“it is DHR’s burden to prove the unsuitability of one who seeks to be considered as the custodian of a dependent child.’ ” Ex parte J.R., 896 So.2d 416, 428 (Ala.2004) (quoting D.S.S. v. Clay County Dep’t of Human Res., 755 So.2d 584, 591 (Ala.Civ.App.1999)).
The father argues that DHR did not perform its legal duty to consider all viable alternatives to termination of the father’s parental rights. In support of this argument, the father cites Ex parte J.R., supra, a termination-of-parental-rights case in which our supreme court found that “DHR presented no evidence that clearly indicated why [the prospective custodians] were ‘unsuitable’ as ... alternative family resource[s].... ” Id. at 428. In Ex parte J.R., the prospective custodians expressed their desire to be relative resources for a child who was approximately seven years old at the time. Id. at 422. The prospective custodians lived in North Carolina, and they were approved as relative resources for the child through the ICPC. Id. The prospective custodians later moved to Alabama and requested a home study of their Alabama residence. Id. However, DHR refused and a DHR social worker petitioned the juvenile court to deny the prospective custodians visitation with the child. Id. The child’s caseworker indicated that the child did not know the prospective custodians and that the child had indicated that she did not want to live with the prospective custodians. Id. at 425. DHR stated that the prospective custodians had not been considered as viable relative resources for placement of the child because DHR was concerned about the relationship between the prospective custodians and the child’s father, who had been convicted of sexually abusing the child’s half sister, and because DHR faulted the prospective custodians for their lack of effort to establish and maintain a relationship with the child. Id. at 424-25. The supreme court stated that DHR’s concern about the relationship between the prospective custodians and the father could have been allayed if DHR had undertaken an investigation of that relationship, but DHR had not done so. Id. at 425. The supreme court concluded that the evidence indicated that “DHR ... did not fully investigate [the prospective custodians’] potential as ... viable family resource[s] before deciding that they did not qualify as ... viable resource[s].” Id. at 427.
Although the facts in J.R. are similar to the facts of the present case, there are also distinguishing factors to consider. For instance, the child in question in J.R. was approximately seven years old when the prospective custodians first sought custody of the child, but the children in the present case were significantly older. Also, the prospective custodians in J.R. had moved to Alabama at some point before the termination of the mother’s parental rights, but the aunt and the uncle in the present case maintained their residence in Illinois. Furthermore, in J.R., the evidence indicated that DHR had affirmatively sought to keep the prospective custodians from visiting the child; however, there was evidence in this case to support a finding that DHR had not affirmatively sought to prohibit contact between the aunt and the uncle in the same manner as occurred in J.R. Finally, unlike the facts of J.R., there is no indication in the record of this case that DHR did not approve the aunt and the uncle as viable relative resources for the children because of a concern that the aunt would allow the father to contact the children or because the aunt and the uncle had not maintained a relationship with the children. All the pertinent evidence in the record indicates that DHR did not approve the aunt and the uncle as relative resources for placement of the children be *1090 cause it thought such placement would be detrimental to the best interests of the children in light of the unwavering desire of the children to maintain stability by being adopted by the foster parents.
The father argues that DHR did not follow the recommendations of the Illinois report and that DHR did not foster communication between the children and the aunt and the uncle. Although the aunt testified that DHR had refused to give her contact information to the children, testimony from the children and Fain put that allegation into dispute, and, pursuant to the ore tenus rule, the juvenile court could have concluded that DHR did provide the aunt’s contact information to the children and that the children themselves chose not to contact the aunt. Furthermore, although it appears undisputed that DHR refused to give the aunt the contact information of the children, the juvenile court could have determined that DHR’s decision not to provide the aunt with the contact information of the children, who were minors, was reasonable considering the children’s testimony that indicated that they did not wish to be contacted by the aunt. Based on this evidence, the juvenile court could have concluded that DHR had not acted as barrier to communication between the children and the aunt.
The father also argues that DHR decided in February 2008 that the children’s best interests would be served by remaining in the home with the foster parents and that Fain indicated that the children’s opinions about living with the aunt and the uncle confirmed her “existing decision” not to pursue the aunt and the uncle as viable relative resources, indicating that DHR never fully investigated the aunt and the uncle before deciding that placement with them was not a viable alternative to termination. However, we note that when DHR filed a report in February 2008 that indicated that the foster parents were the best place for the children, the Illinois report had not been completed and there was no way for DHR to know whether the aunt and the uncle would be approved as relative resources. Thus, we find no violation of DHR’s duty to seek viable alternatives to termination in the fact that DHR believed that the best placement for the children in February 2008 was with the foster parents. Also, we find nothing in the record that supports the father’s allegation that DHR had already decided not pursue the aunt and the uncle as viable relative resources at the time that the children wrote letters in February 2008 expressing them opinions about living with the aunt. Instead, the evidence indicated that, despite the unwavering sentiment of the children, DHR had allowed the aunt to participate in an ISP in the summer of 2008, that DHR had provided the children with the aunt’s contact information, and that the children were told that they could call the aunt anytime they desired. In August 2008, after receiving the approved home study from Illinois, representatives from DHR, including Fain and her supervisor, after considering the ages of the children and them clearly expressed opinions on the matter, decided against pursuing the aunt and the uncle as relative resources for placement of the children. Thus, we conclude that there was evidence to support a finding that DHR had fully investigated the aunt and the uncle before deciding that they were not viable relative resources for placement of the children.
After a thorough review of the record, we conclude that DHR presented evidence that, when weighed against evidence in opposition, could have placed a firm conviction in the mind of the trier of fact that the aunt and the uncle were not suitable custodians for these children. See J.B., supra. Undisputed evidence re *1091 vealed that the children were happy in their placement with the foster parents, that they had established stability, that they did not want to live with the aunt, that they did not want to pursue a relationship with the aunt, and that they did not want to relocate to Illinois. There was also undisputed testimony that the children had threatened to run away if DHR forced them to move to Illinois to live with the aunt and the uncle. Based on those facts, DHR determined that placing the children with the aunt and the uncle would not be in their best interest. Thus, unlike in J.R., DHR, in this case, did present evidence that, under the totality of the circumstances, could have led to a conclusion that the aunt and the uncle were unsuitable to take custody of the children.
“In assessing the fitness and qualification of a relative to assume custody of dependent children, the juvenile court is required to consider all the evidence relating to the relative’s ability to serve the best interests of the child.” J.B., 991 So.2d at 284 (citing Ex parte J.R., supra). Undoubtedly, the aunt and the uncle were qualified to care for the children in the respect that their background and their resources did not prevent such placement. Nonetheless, DHR produced clear and convincing evidence indicating that the best interests of the children would not be served by placing them in the custody of the aunt and the uncle. “Whether a relative is suitable to assume custody of a child and whether such placement serves the best interests of the child are both questions of fact to be determined by the juvenile court.” R.L.M.S. v. Eto-wah County Dep’t of Human Res., 37 So.3d 805, 812 (Ala.Civ.App.2009) (citing T.B. v. Cullman County Dep’t of Human Res., 6 So.3d 1195, 1204-05 (Ala.Civ.App.2008)). Based on evidence submitted at the final hearing, the juvenile court could have concluded that placement with the aunt and the uncle would not have served the best interests of the children and, thus, that placement with the aunt and the uncle was not truly a “viable” alternative to termination of the father’s parental rights.
Finally, the father argues that the finding of fact contained in paragraph 15 of the final judgment was clearly erroneous because he interprets the above-quoted statement as a finding that DHR had undertaken reasonable efforts “toward rehabilitation of the relationship between the minor children and [their] relatives.”[9] Initially, we note that we do not interpret paragraph 15 of the final judgment as a finding that DHR exerted reasonable efforts to rehabilitate the relationship between the children and their relatives. However, even if the father’s interpretation of paragraph 15 is accurate, it does not require reversal. Pursuant to former § 12-15-65(m), Ala.Code 1975,[10] unless an exception applied, DHR was' required to provide rehabilitative services to the parents aimed at family reunification. See B.J.K.A. v. Cleburne County Dep’t of Human Res., 28 So.3d 765, 770 (Ala.Civ.App.2009) (stating that “[t]here is no question that DHR is required to exert reasonable efforts toward the reunification of a parent and his or her child, except in limited circumstances.... ”). Once DHR deter *1092 mined that continuation of reasonable efforts was inconsistent with the permanency plan for the children, former § 12-15-65(m) further required DHR to make reasonable efforts to complete whatever steps were necessary to finalize the permanency plans of the children.
Our caselaw interprets former § 12-15-65(m) as containing a requirement on the part of DHR to exert reasonable efforts to reunite a child and its parents, see B.J.K.A. v. Cleburne County Dep’t of Human Res., supra, and the father cites no authority to show that DHR is required to rehabilitate the relationship between dependent children and possible relative resources, especially where it has been determined that placement with those relatives would not serve the best interests of the children. Thus, because DHR was not required to establish that they had made reasonable efforts to rehabilitate the relationship between the children and their relatives, specifically, the aunt and the uncle, any erroneous finding that the DHR did so was harmless error. See Rule 45, Ala. R.App. P. (“No judgment may be reversed or set aside ... unless in the opinion of the court to which the appeal is taken ... it should appear that the error complained of has probably injuriously affected the substantial rights of the parties.”).

Conclusion

Based on the above analysis, the judgment of the juvenile court is due to be affirmed. As noted earlier, DHR’s motion to supplement the record on appeal is denied.
AFFIRMED.
THOMPSON, P.J., and PITTMAN, J., concur.
MOORE, J., concurs specially, in which, Thomas, J., joins.

. The fourth and oldest child of the mother and the father, D.J.H., turned 19 shortly after the final hearing, and DHR did not seek to terminate the parental rights of the mother and the father to D J.H.

. The father’s postjudgment motion was denied by operation of law on September 17, 2009. The juvenile court purported to amend its August 25, 2009, judgment after September 17, 2009, but all judgments puiporting to amend its August 25, 2009, judgment after September 17, 2009, were a nullity. See B.L.T. v. V.T., 12 So.3d 123, 124 (Ala.Civ.App.2008).

. Because the mother has not appealed the judgment terminating her parental rights and because the father does not appeal the juvenile court’s determination that the children were dependent, we set forth the facts of this case that are relevant to the issues presented by the father on appeal.

.The record indicated that K.H. had been in at least five different foster-care placements since November 2006: she was initially placed in a psychiatric hospital, and at different times thereafter she was placed in a Presbyterian Home for Children, a facility called Mountain View, a facility operated by Lee *1084 County Youth Development, and eventually the home of the foster parents.

. The exhibits that were entered into evidence during the final hearing were lost, and they are not a part of the record on appeal. The *1085 parties were unable to stipulate to the exhibits that were entered into evidence. We have relied on the portions of the exhibits that were entered into evidence and read into the record. DHR’s motion to supplement the record on appeal is denied.

. D.J.H., who was a minor at the time, also wrote a letter that stated: "I don’t want to live with [the aunt] or [the father], I hate [the father]. Tell him that. So hell no and no phone.”

. We note that the oldest child, D.J.H., was on "runaway status” at the time of the final hearing.

. By Act No. 2008-277, Ala. Acts 2008, the provisions of the former Alabama Juvenile Justice Act, § 12-15-1 et seq., Ala.Code 1975, were either repealed or amended, renumbered, and incorporated into the current Alabama Juvenile Justice Act (“the AJJA”), § 12-15-101 et seq., Ala.Code 1975. Former § 12-15-71(a)(3)c. has been renumbered as § 12-15-314(a)(3)c, Ala.Code 1975, and the two provisions are substantially similar.

. We reject DHR’s contention that the father did not properly preserve this argument for appellate review because the father did not specifically challenge this finding before the juvenile court. See Creel v. Crim, 812 So.2d 1259, 1261 n. 1 (Ala.Civ.App.2001) (citing Ex parte Vaughn, 495 So.2d 83, 87 (Ala.1986)) ("express findings of fact by a trial court will in and of themselves preserve for appellate review the sufficiency of the evidence to support those findings”).

. See note 8, supra. Former § 12-15-65(m), Ala.Code 1975, was amended and renumbered as § 12-15-312(b), Ala.Code 1975.