DONALDSON, Judge.
A.M. ("the father") appeals from a judgment of the Houston Juvenile Court ("the juvenile court") granting the petition of the Houston County Department of Human Resources ("DHR") to terminate his parental rights to J.L.M. ("the child"). The father challenges the juvenile court's jurisdiction over the proceedings under the Uniform Child Custody Jurisdiction and Enforcement Act ("the UCCJEA"), § 30-3B-101 et seq., Ala. Code 1975, and the juvenile court's decision to terminate his parental rights to the child. As discussed infra, we hold that the juvenile court had jurisdiction under the UCCJEA and that the juvenile court's decision to terminate the father's parental rights is supported by the evidence presented at trial. Accordingly, we affirm the judgment.
Facts and Procedural History
In February 2015, the father and E.C. ("the mother") were traveling from New Mexico to Florida. The mother became ill during the trip. According to the father, he and the mother stopped in Dothan to visit a friend while the mother recovered from her illness. The mother remained ill for approximately two weeks; she was then rushed to the hospital where she gave birth to the child on February 16, 2015. At that time, the child and the mother both tested positive for marijuana and the father tested positive for methamphetamine.
On February 19, 2015, DHR filed a dependency petition in the juvenile court, which was docketed as case no. JU-15-97.01 ("the dependency proceeding"). In that petition, DHR asserted that the child had no parent to care for him, that the father had tested positive for methamphetamine the day after the child was born, that the mother had an extensive history regarding protective services for other children in New Mexico, that there were pending felony drug charges against the mother, and that, regarding the mother, there was a pending extradition request *1213 from the State of New Mexico. The juvenile court entered a shelter-care order in the dependency proceeding on February 19, 2015, transferring custody of the child to DHR and setting an adjudicatory hearing for April 16, 2015.
The father completed an affidavit of substantial hardship, and an attorney was appointed to represent him in the dependency proceeding. The record indicates that, as of March 16, 2015, the mother was incarcerated in New Mexico. As of April 8, 2015, the father had returned to New Mexico, but he informed DHR that he would return to Alabama to comply with DHR's goals toward reunification. On April 16, 2015, the juvenile court entered an order adjudicating the child to be dependent after a hearing at which the father was present and conceded the child's dependency. The record indicates that the mother was still incarcerated in New Mexico at the time of the dependency hearing.
On November 30, 2016, DHR filed a petition seeking to terminate the father's and the mother's parental rights to the child, which was docketed as case no. JU-15-97.02 ("the termination proceeding"). On January 25, 2017, P.M. ("the paternal grandmother") and C.M. ("the paternal aunt") filed a joint motion to intervene in the termination proceeding, which was later granted.
DHR filed a motion seeking to serve the parents by publication in Alamogordo, New Mexico, and Dothan, Alabama. Thereafter, the attorney representing the paternal grandmother and the paternal aunt filed a notice of appearance of limited scope in the termination proceeding on behalf of the father for the sole purpose of contesting the juvenile court's jurisdiction.
On February 7, 2017, the father, the paternal grandmother, and the paternal aunt filed a joint motion seeking to dismiss the termination proceeding or to transfer the action to the State of New Mexico. They attached to their motion affidavits from the father and the paternal aunt indicating that the parties had always been residents of New Mexico and that they had no significant contacts with Alabama. DHR filed a response in which it asserted that the child had been in the physical custody of DHR since February 2015, that the father had not contested the juvenile court's jurisdiction in the dependency proceeding, and that the child had resided in Alabama since his birth. On April 12, 2017, after a hearing, the juvenile court entered an order denying the motion to dismiss.
The juvenile court conducted a trial in the termination proceeding on April 13, 2017. Chermaine Gartmond, the foster-care worker assigned to the child's case, testified that she had worked with the child since February 19, 2015, when he entered DHR's custody. Gartmond testified that the mother was incarcerated in a county detention facility in New Mexico at the time of the trial. Gartmond also testified that the mother had sent a letter to DHR shortly after the child was placed in DHR's custody in February 2015 but that the mother had no further contact with the child. According to Gartmond, at one point the mother had escaped from the detention facility in New Mexico, but she was later located and incarcerated again.
Gartmond testified that the father had not had any physical contact with the child since April 16, 2015. According to Gartmond, DHR had offered to pay the costs associated with lodging and meals for the father if he secured transportation to Alabama to have contact with the child, but the father never returned to Alabama. Gartmond testified that, in an effort to reunite the father and the child, DHR had asked the father to participate in parenting classes and to undergo substance-abuse treatment. Gartmond testified that *1214 she had received documentation that indicated that the father had completed a parenting class and an assessment for substance-abuse services in New Mexico but that the father had not followed up with the recommended substance-abuse treatment. Gartmond testified that the father had stated that he would like for the child to be adopted by the paternal grandmother or the paternal aunt.
Gartmond also testified about various potential relative resources for the child. While the mother was still in the hospital in Alabama after the birth of the child, she provided DHR with a list of potential relative resources, which included S.C., the child's maternal grandfather, and two other unspecified relatives. Gartmond testified that S.C., who was residing in Florida, indicated that he was unable to take custody of the child but that he would assist the mother or the father if they received custody of the child. Gartmond testified that another worker contacted two other unspecified maternal relatives located in New Mexico but that those relatives indicated that they were not able to care for the child and that they suffered from substance-abuse issues.
Gartmond testified that DHR had worked with the paternal grandmother in an attempt to place the child with her. The paternal grandmother completed the Interstate Compact for the Placement of Children ("ICPC") process in New Mexico. The initial ICPC report prepared by a New Mexico agency following a home-study of the paternal grandmother was unfavorable, based on issues related to her financial problems, her criminal history involving a guilty plea for marijuana possession in 2003, and concerns related to her capacity to protect the child from the father. Gartmond testified that the paternal grandmother had only $66 in monthly discretionary income. Gartmond also stated that the father had indicated that he wanted to live with the paternal grandmother and the child, that the paternal grandmother became easily agitated when questioned about her capacity to protect the child, and that she was unable to state how she would be able to provide supervision for the child. An addendum to the ICPC report explained that the initial recommendation was to deny the paternal grandmother's home as an acceptable placement for the child based on concerns regarding the paternal grandmother's impulse control and judgment. The addendum explained that, overall, the results of the home study on the paternal grandmother were positive, that the paternal grandmother had been gainfully employed for many years, and that the paternal grandmother had received positive recommendations. Gartmond also testified that the paternal grandmother had expressed that she was financially unable to secure transportation to travel to Alabama to visit the child, even though DHR had offered to assist with her lodging and food expenses.
Gartmond testified that DHR had also considered the paternal aunt and her husband as potential relative resources for the child. According to Gartmond, the paternal aunt first contacted DHR in July 2016, when she was living in Japan with her husband who was stationed there as part of his service in the United States military. The paternal aunt indicated that she and her husband would be returning to New Mexico, and Gartmond informed her that she would need to complete the ICPC process in New Mexico once she returned. Gartmond testified that the paternal aunt returned to New Mexico in November 2016 and that she provided her with information related to the ICPC process. Gartmond testified that, in order to begin the ICPC process, the paternal aunt was required to first submit a notarized letter stating her intent to provide for the child *1215 and identifying how she is able to do so. According to Gartmond, the paternal aunt had still not completed that step as of the trial date in April 2017. Gartmond also testified that the paternal aunt had indicated that she wanted to visit with the child, but that she had not done so. Gartmond testified that neither the paternal grandmother nor the paternal aunt had ever seen the child in person. Gartmond opined that the juvenile court should grant the termination petition so that DHR could obtain permanency for the child, who had been in foster care his entire life-over two years at the time of the trial.
Rae Bryan, the service supervisor for the foster-care unit of DHR, testified that she spoke with the paternal aunt, informed her of the ICPC process, and asked for her permanent address. The paternal aunt told Bryan that she would have to contact DHR later to provide a permanent address, but she did not provide that address until the day before the trial in the termination proceeding. Bryan also testified that DHR had contacted a paternal uncle who was not interested in serving as a placement for the child.
Bryan testified that, despite the New Mexico agency's recommendation that the paternal grandmother's home be approved as an acceptable placement for the child, DHR did not approve it based on concerns related to the paternal grandmother's protective capacities and her display of poor judgment. Bryan read the following from the ICPC report:
"There are concerns regarding [the paternal grandmother's] impulse control and judgment. She has made poor decisions in the past with her son, [E.], hiding marijuana for him. More recently, she has not had insurance for her vehicle. There are concerns about her ability to keep [the child] safe and may trust [the father] when she shouldn't. There are concerns regarding her ability to control her anger. While it is understandable that she is upset with this investigator when her protective capacities were questioned, there appears to be a pattern of her losing her temper."
Toward the end of the trial, the attorney for the father, the paternal grandmother, and the paternal aunt told the juvenile court that "a case ha[d] been opened" in the State of New Mexico the day before the trial. The attorney provided a case number and a judge's name but did not indicate what type of case had been opened or provide additional details. The juvenile court advised the attorney that the trial on the termination proceeding would continue and that the attorney should file a notice with the juvenile court containing information regarding the New Mexico case. The record does not indicate that the juvenile court was provided with written notice of the name or case number of any other action concerning the child in any other state or any documentation relating to any other proceedings. The father does not assert on appeal that the juvenile court failed to follow any provisions of the UCCJEA regarding communications with a court in any other state.
On May 3, 2017, the juvenile court entered a judgment that, among other things, terminated the parental rights of the father to the child. On May 16, 2017, the father timely filed a notice of appeal to this court. Neither the mother, nor the paternal grandmother, nor the paternal aunt filed a notice of appeal.
Discussion
On appeal, the father challenges the juvenile court's subject-matter jurisdiction over the termination proceeding and the juvenile court's decision to terminate his parental rights.
*1216 I. Jurisdiction
The father asserts that Alabama lacked jurisdiction over the dependency proceeding and the termination proceeding under the UCCJEA and that the juvenile court should have transferred the proceeding to New Mexico.
"The UCCJEA is a jurisdictional act that establishes subject-matter jurisdiction over child-custody proceedings." H.T. v. Cleburne Cty. Dep't of Human Res., 163 So.3d 1054, 1062 (Ala. Civ. App. 2014). The UCCJEA differentiates between a court's jurisdiction to make an "initial child custody determination" and a court's "continuing, exclusive jurisdiction" over a child-custody determination. See §§ 30-3B-201 and -202, Ala. Code 1975. A "child custody proceeding" is "[a] proceeding in a court in which legal custody, physical custody, or visitation with respect to a child is an issue" and includes proceedings alleging dependency and seeking termination of parental rights. § 30-3B-102(4), Ala. Code 1975. A "child custody determination" is defined as "[a] judgment, decree, or other order of a court providing for the legal custody, physical custody, or visitation with respect to a child. The term includes a permanent, temporary, initial, and modification order." § 30-3B-102(3). An "initial determination" is defined as "[t]he first child custody determination concerning a particular child." § 30-3B-102(8).
Because the April 2015 dependency judgment was the initial determination for purposes of the UCCJEA, we must determine whether the juvenile court had continuing, exclusive jurisdiction pursuant to § 30-3B-202 over the termination proceeding. Section 30-3B-202 provides:
"(a) Except as otherwise provided in Section 30-3B-204, [Ala. Code 1975,] a court of this state which has made a child custody determination consistent with Section 30-3B-201 or Section 30-3B-203[, Ala. Code 1975,] has continuing, exclusive jurisdiction over the determination until:
"(1) A court of this state determines that neither the child, nor the child and one parent, nor the child and a person acting as a parent have a significant connection with this state and that substantial evidence is no longer available in this state concerning the child's care, protection, training, and personal relationships; or
"(2) A court of this state or a court of another state determines that the child, the child's parents, and any person acting as a parent do not presently reside in this state.
"(b) A court of this state which has made a child custody determination and does not have continuing, exclusive jurisdiction under this section may modify that determination only if it has jurisdiction to make an initial determination under Section 30-3B-201."
Although the father did not appeal from the April 2015 dependency judgment or challenge the jurisdiction of the juvenile court in the dependency proceeding, we must examine whether the juvenile court had jurisdiction to make the initial child-custody determination, pursuant to § 30-3B-201(a), in the dependency proceeding in order to determine whether the juvenile court properly exercised continuing, exclusive jurisdiction over the termination proceeding pursuant to § 30-3B-202.
Pursuant to § 30-3B-201(a), which is "the 'exclusive jurisdictional basis' for an Alabama court to ascertain whether it has subject-matter jurisdiction to make an initial child-custody determination," H.T., 163 So.3d at 1062, a court may make an initial child-custody determination only if one of the following applies:
*1217 "(1) This state is the home state of the child on the date of the commencement of the proceeding, or was the home state of the child within six months before the commencement of the proceeding and the child is absent from this state but a parent or person acting as a parent continues to live in this state;
"(2) A court of another state does not have jurisdiction under subdivision (1), or a court of the home state of the child has declined to exercise jurisdiction on the ground that this state is the more appropriate forum under Section 30-3B-207 or 30-3B-208, [Ala. Code 1975,] and:
"a. The child and the child's parents, or the child and at least one parent or a person acting as a parent, have a significant connection with this state other than mere physical presence; and
"b. Substantial evidence is available in this state concerning the child's care, protection, training, and personal relationships;
"(3) All courts having jurisdiction under subdivision (1) or (2) have declined to exercise jurisdiction on the ground that a court of this state is the more appropriate forum to determine the custody of the child under Section 30-3B-207 or 30-3B-208 ; or
"(4) No court of any other state would have jurisdiction under the criteria specified in subdivision (1), (2), or (3)."
Section 30-3B-201(a)(1) provides that "a court of this state has jurisdiction to make an initial child custody determination" if "[t]his state is the home state of the child on the date of the commencement of the proceeding, or was the home state of the child within six months before the commencement of the proceeding ...." Because the child was less than six months old on the date of the commencement of the dependency proceeding, the child's "home state" is defined as "the state in which the child lived from birth" with a parent or a person acting as a parent. § 30-3B-102(7).
The father argues that Alabama lacked home-state jurisdiction over the dependency proceeding. In support of his argument, the father cites H.T., supra. In H.T., the mother appealed from a judgment terminating her parental rights. The mother argued, among other things, that Alabama was not the child's home state under the UCCJEA at the time dependency proceedings were initiated in Alabama, and, therefore, she asserted that the juvenile court lacked continuing jurisdiction to terminate her parental rights to the child. 163 So.3d at 1063. The mother in H.T. gave birth to the child in the State of Georgia, and the Cleburne County DHR removed the child from the hospital and initiated dependency proceedings in Alabama. Id. The mother argued that the child had "lived from birth" in Georgia. Id. at 1064. This court held, among other things, that "a limited hospital stay in a state following birth, without more, is insufficient to establish a home state for the child as that term is defined by § 30-3B-102(7)." Id. at 1065. This court explained that the mother had provided an Alabama address to the Cleburne County DHR, that that address was contained on other documents in the record, and that the mother had moved frequently between Alabama and Georgia before the child was born. Id. at 1066. This court also held that, based on the circumstances in that case, the child did not have a "home state" under the UCCJEA. We further determined, however, that the juvenile court in H.T. had jurisdiction pursuant to § 30-3B-201(a)(2) of the UCCJEA, which "requires there to be a significant connection between the state and the child and at least one parent, as well as the availability of substantial evidence in the *1218 state relevant to the child-custody determination." Id.
The present case is similar to H.T. because, at the time the dependency proceeding was initiated, the child had no home state pursuant to § 30-3B-201(a)(1) and § 30-3B-102(7). Applying this court's holding in H.T., excepting his hospital stay, the child in this case, before the dependency proceeding, had not otherwise been present in Alabama and could not be deemed to have "lived from birth" in Alabama. Likewise, the child had never even been present in New Mexico to create home-state jurisdiction for that state. We must next determine whether the juvenile court had jurisdiction to make an initial child-custody determination, pursuant to subdivisions (2), (3), or (4) of § 30-3B-201(a), in the dependency proceeding.
Section 30-3B-201(a)(2) provides an Alabama court with jurisdiction to make an initial child-custody determination if
"[a] court of another state does not have jurisdiction under subdivision (1), or a court of the home state of the child has declined to exercise jurisdiction on the ground that this state is the more appropriate forum under Section 30-3B-207 or 30-3B-208, [Ala. Code 1975,] and:
"a. The child and the child's parents, or the child and at least one parent or a person acting as a parent, have a significant connection with this state other than mere physical presence; and
"b. Substantial evidence is available in this state concerning the child's care, protection, training, and personal relationships."
An Alabama court would not have been able to exercise jurisdiction under subdivision (2) at the time of the dependency proceeding because the child and his parents did not have a "significant connection" with Alabama and "[s]ubstantial evidence" was not available in Alabama concerning the child at that time. In order for jurisdiction to have been proper in New Mexico under this subdivision, the child and at least one parent must have had a "significant connection" with New Mexico and"[s]ubstantial evidence ... concerning the child's care, protection, training, and personal relationships" must have been available in New Mexico. We are not directed to any evidence, let alone substantial evidence, concerning any connection of the child to New Mexico. Accordingly, New Mexico also would not have had jurisdiction under subdivision (2).
In order for either Alabama or New Mexico to exercise jurisdiction under § 30-3B-201(a)(3), "[a]ll courts having jurisdiction under subdivision (1) or (2) [must] have declined to exercise jurisdiction on the ground that a court of this state is the more appropriate forum to determine the custody of the child under Section 30-3B-207 or 30-3B-208[, Ala. Code 1975]." Neither Alabama nor New Mexico would have had jurisdiction under subdivision (3), because no other state had jurisdiction under subdivision (1) or (2) and, thus, no other state could have declined to exercise jurisdiction.
Because New Mexico did not have jurisdiction under the criteria contained in the UCCJEA, and because no other state would have had jurisdiction, the Alabama juvenile court had jurisdiction in the dependency proceeding to make an initial child-custody determination under § 30-3B-201(a)(4) because "[n]o court of any other state would have jurisdiction under the criteria specified in subdivision (1), (2), or (3)."
Having determined that the juvenile court had jurisdiction to enter the initial child-custody determination (the dependency judgment), we now turn to the *1219 question whether the juvenile court retained continuing, exclusive jurisdiction to enter further custody orders (i.e., the termination judgment). As explained above, a court of this state that properly makes an initial child-custody determination retains continuing, exclusive jurisdiction over the child-custody determination until "a court of this state determines that neither the child, nor the child and [at least] one parent, ... have a significant connection" with Alabama or that the parents and the child no longer reside in Alabama and substantial evidence concerning the child is no longer available in Alabama. § 30-3B-202(a)(1).
The undisputed evidence indicated that the child had remained in Alabama since his birth and that all records pertaining to the child are located in Alabama. After his discharge from the hospital into DHR's custody in February 2015, the child has remained in foster care in Alabama. At the time of the trial in the termination proceeding, the child had been cared for by a foster family in Alabama and had received medical treatment and services in Alabama for over two years. There is no evidence to suggest that the factors necessary to absolve an Alabama court of its continuing, exclusive jurisdiction exist in this case. Therefore, the juvenile court properly exercised its continuing jurisdiction under § 30-3B-202 of the UCCJEA.[1]
The father also argues that, even if the juvenile court had jurisdiction, pursuant to § 30-3B-207, "Alabama should relinquish jurisdiction based on the fact that Alabama is simply an inconvenient forum for the primary parties." That section provides that an Alabama court with jurisdiction "may decline to exercise its jurisdiction at any time if it determines that it is an inconvenient forum under the circumstances and that a court of another state is a more appropriate forum." § 30-3B-207(a). We review a trial court's decision regarding whether it is an inconvenient forum under § 30-3B-207 for an abuse of discretion. See Ramsey v. Ramsey, 995 So.2d 881, 886 (Ala. Civ. App. 2008) ("we must affirm that determination [i.e., the trial court's determination regarding whether it was an inconvenient forum under § 30-3B-2017] unless the appellant demonstrates that the trial court abused its discretion"). The father asserts that the child's paternal relatives have limited financial resources and that it is "unrealistic and unreasonable to expect that ... [they] would be able to come to Alabama with any great regularity or for any extended amount of time." The evidence indicated that the paternal grandmother and the paternal aunt had never physically met the child despite offers of financial assistance from DHR, that the father's last contact with the child was in April 2015, and that the father, the paternal grandmother, and the paternal aunt, despite knowledge of the pendency of the termination proceeding, did not institute proceedings in New Mexico until, according to their attorney's assertions, the day before trial.[2] The evidence further indicated that the child had lived in Alabama with his foster parents *1220 since his birth and that records pertinent to the child are located in Alabama. The juvenile court could have determined that the father, the paternal grandmother, and the paternal aunt had not demonstrated a sincere interest in participating in the child's life or in these proceedings. Based on the evidence in the record, the juvenile court did not abuse its discretion in refusing to transfer the action to New Mexico.
II. Termination of Parental Rights
The father also challenges the juvenile court's decision to terminate his parental rights. In determining whether to terminate the father's rights to the child, "[the] juvenile court [was] required to apply a two-pronged test ...: (1) clear and convincing evidence must support a finding that the child is dependent; and (2) the court must properly consider and reject all viable alternatives to a termination of parental rights." B.M. v. State, 895 So.2d 319, 331 (Ala. Civ. App. 2004) (citing Ex parte Beasley, 564 So.2d 950, 954 (Ala. 1990) ). Moreover, the factors a juvenile court should consider when determining whether to terminate a parent's parental rights are located in § 12-15-319, Ala. Code 1975. We have further explained that
"appellate courts must apply a presumption of correctness in favor of the juvenile court's findings in a termination-of-parental-rights action. J.C. v. State Dep't of Human Res., 986 So.2d 1172, 1183 (Ala. Civ. App. 2007). 'Additionally, we will reverse a juvenile court's judgment terminating parental rights only if the record shows that the judgment is not supported by clear and convincing evidence.' Id. See Ex parte McInish, 47 So.3d 767, 774 (Ala. 2008) (explaining standard of review of judgment resting upon factual determinations required to be based on clear and convincing evidence)."
S.S. v. Calhoun Cty. Dep't of Human Res., 212 So.3d 940, 949 (Ala. Civ. App. 2016). "When [the juvenile court's] findings rest on ore tenus evidence, this court presumes their correctness." K.S.B. v. M.L.B., 219 So.3d 650, 653 (Ala. Civ. App. 2016). "Furthermore, when the juvenile court has not made specific factual findings in support of its judgment, we must presume that the juvenile court made those findings necessary to support its judgment, provided that those findings are supported by the evidence." K.P. v. Etowah Cty. Dep't of Human Res., 43 So.3d 602, 605 (Ala. Civ. App. 2010) (citing D.M. v. Walker Cty. Dep't of Human Res., 919 So.2d 1197, 1210 (Ala. Civ. App. 2005) ).
The father tested positive for methamphetamine when the child was born, and the father admitted that he was unable to care for the child. In order to reunite with the child, the father was asked to obtain substance-abuse treatment and to complete parenting classes. Although the evidence indicated that the father had completed parenting classes, the father did not complete substance-abuse treatment. Further, at the time of the trial in the termination proceeding, the father had not seen or communicated with the child in over a year, and he had not provided any financial support for the child. Based on the evidence in the record, the juvenile court could have found that the father had "abandoned the child," § 12-15-319(a)(1) ; that the father had a history of "excessive use of ... [a] controlled substance[ ], of a duration or nature as to render [him] unable to care for the needs of the child," § 12-15-319(a)(2) ; that "reasonable efforts by [DHR] ... leading toward the rehabilitation of the [father] had failed," § 12-15-319(a)(7) ; that the father had failed "to maintain regular visits with the child" or "to maintain consistent contact" with the child, § 12-15-319(a)(10) and (11) ; and that the father had failed "to adjust his ...
*1221 circumstances to meet the needs of the child," § 12-15-319(a)(12).
The father also argues that DHR did not use reasonable efforts to reunite the family.
"Whether DHR has made reasonable efforts to reunite a parent and a child is a fact-dependent inquiry. J.B. v. Jefferson Cnty. Dep't of Human Res., 869 So.2d 475, 482 (Ala. Civ. App. 2003). '[T]he efforts actually required by DHR in each case, whether the court is considering rehabilitation or reunification, depend on the particular facts of that case, the statutory obligations regarding family reunification, and the best interests of the child.' J.B., 869 So.2d at 482."
A.M.F. v. Tuscaloosa Cty. Dep't of Human Res., 75 So.3d 1206, 1210 (Ala. Civ. App. 2011). The father asserts that DHR failed to follow through with potential relative resources and he asserts that that demonstrates a lack of reasonable efforts toward reunification. We first note that this court has held that "DHR [is] not required to establish that [it] ... made reasonable efforts to rehabilitate the relationship between the children and their relatives ...." D.F.H. v. State Dep't of Human Res., 51 So.3d 1081, 1092 (Ala. Civ. App. 2010). In order to reunite with the child, the father was asked to complete substance-abuse treatment and parenting classes. Although the evidence indicated that the father had completed parenting classes, the father did not complete substance-abuse treatment. The evidence also indicates that the father made no effort to inquire about the child or otherwise maintain a relationship with him, despite financial assistance having been offered by DHR. Based on the information contained in the record, "the juvenile court reasonably could have concluded that an adequate amount of time and effort had been expended in an attempt to rehabilitate the [father] but that further time and effort would not help achieve the goal of family reunification in light of the [father's] lack of progress ...." M.A.J. v. S.F., 994 So.2d 280, 292 (Ala. Civ. App. 2008) (noting that "the law speaks in terms of 'reasonable' efforts, not unlimited or even maximal efforts").
The father also argues that viable alternatives to the termination of his parental rights existed. The father points to the paternal grandmother and the paternal aunt as relative resources that he asserts constitute viable alternatives to termination. " 'Whether a relative is suitable to assume custody of a child and whether such placement serves the best interests of the child are both questions of fact to be determined by the juvenile court.' " D.F.H., 51 So.3d at 1091 (quoting R.L.M.S. v. Etowah Cty. Dep't of Human Res., 37 So.3d 805, 812 (Ala. Civ. App. 2009), citing in turn T.B. v. Cullman Cty. Dep't of Human Res., 6 So.3d 1195, 1204-05 (Ala. Civ. App. 2008) ).
Although the ICPC report indicated that the paternal grandmother's home had been approved by the New Mexico agency, the evidence indicated that the initial recommendation had been to deny the paternal grandmother's home as an acceptable placement for the child based on various concerns related to the paternal grandmother's financial instability and her capacity to protect the child from the father. The evidence indicated that the paternal grandmother had not ever visited the child, despite offers of financial assistance from DHR, and the paternal grandmother had not filed a petition seeking custody of the child. With regard to the paternal aunt, the evidence indicated that, although she had been advised of the necessary steps in order to complete the ICPC process, she had not even begun the process at the time of the trial in the termination *1222 proceeding. Likewise, the paternal aunt had never attempted to visit with the child. Based on the evidence in the record, the juvenile court could have determined that neither the paternal grandmother nor the paternal aunt were suitable relative resources for the child.
Furthermore, the evidence indicated that the father has not adjusted his circumstances or made much effort to reunite with the child in over two years.
"This court has held that leaving a child in foster care when the parent ... is not progressing toward reunification is not a viable alternative to the termination of parental rights. T.G. v. Houston County Dep't of Human Res., 39 So.3d 1146, 1152-53 (Ala. Civ. App. 2009) ; R.L.B. v. Morgan County Dep't of Human Res., 805 So.2d 721, 725 (Ala. Civ. App. 2001). This court has rejected 'maintain[ing] the children in foster care until, perhaps, the mother could rehabilitate herself sufficiently to become a fit mother' when the court concluded that the possibility of such rehabilitation was 'remote.' S.B. v. State Dep't of Human Res., 743 So.2d 470, 472 (Ala. Civ. App. 1999)."
Jefferson Cty. Dep't of Human Res. v. L.S., 60 So.3d 308, 315-16 (Ala. Civ. App. 2010). Ultimately, "the paramount concern in [termination] proceedings is the child's best interests." J.V. v. State Dep't of Human Res., 656 So.2d 1234, 1235 (Ala. Civ. App. 1995). The juvenile court could have determined that the child's best interests would be served by terminating the father's parental rights and allowing the child to have permanency through adoption by his foster parents-the caregivers with whom he had been since his birth.
Because the juvenile court properly exercised its continuing jurisdiction under § 30-3B-202 of the UCCJEA and because the juvenile court's decision to terminate the father's parental rights is supported by clear and convincing evidence, we affirm the judgment.
AFFIRMED.
Pittman and Thomas, JJ., concur.
Thompson, P.J., and Moore, J., concur in the result, without writings.

We note that, even if the juvenile court did not properly exercise jurisdiction over the dependency proceeding and that, therefore, the dependency judgment is void, as the father suggests, based on the facts and circumstances in this case, the juvenile court could have exercised jurisdiction to make an initial child-custody determination in the termination proceeding on the basis that by the time the termination proceeding was initiated, Alabama was the home state of the child pursuant to § 30-3B-201(a)(1).

We again note that the institution of proceedings in New Mexico is merely an assertion by the father's counsel; no evidence is contained in the record related to the existence of those purported proceedings.